FREDERICK SILGAR

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Mt. Vernon November 16, 1883.*

CRIMINAL LAW—*whether murder, or only manslaughter.* On the trial of
a person upon the charge of murder, and of which he was convicted, it
appeared the person who was killed had entered upon the premises of the
prisoner in a menacing manner, and during the quarrel which ensued, and
which he commenced, he was killed. The circumstances attending the diffi-
culty and the result, as detailed in the opinion of the court, were held not
to justify a conviction for murder, but, at most, would make a case of man-
slaughter.

WRIT OF ERROR to the Circuit Court of Jackson county;
the Hon. O. A. HARKER, Judge, presiding.

Mr. GREEN P. HARBEN, and Mr. H. H. HOWE, for the plain-
tiff in error.

Mr. JAMES McCARTNEY, Attorney General, for the People.

Mr. BENJ. W. MOORE, and Mr. WM. A. SCHWARTZ, also for
the People.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

At the August term, 1882, of the Jackson county circuit
court, Frederick (*alias* Fritz) Silgar was tried and convicted
for the murder of John Eararth, the jury fixing his punish-
ment at death. Motions for a new trial and in arrest of
judgment having been severally overruled, he was duly sen-
tenced by the court to be hung, in pursuance of the verdict.
The accused brings the record here for review, and has as-
signed thereon various reasons why the judgment and sen-
tence should be reversed, and the cause submitted to another
jury.

The homicide occurred on the premises of the accused, near the hour of five o'clock of the afternoon on the 7th of May, 1882, in an altercation between the deceased and the prisoner, which was witnessed by but two persons outside of the parties engaged in it, namely, Charles Woolsey and Joseph W. Blaylock,—the former a lad not quite fourteen years of age, being, as he claims, most of the time within a few yards of the parties, and the latter a man of mature age, though of defective hearing, and some two hundred and twenty-five yards distant at the time of the occurrence. The parties were evidently under a high state of excitement, for other witnesses, at a distance of from four to six hundred yards off, swear that their attention was attracted by the quarrel, and that they could distinctly recognize the voices of two persons engaged in it. The accused and deceased were both Germans, and much of the conversation between them during the altercation was in the German language, and was not understood by either of the two witnesses who claim to have heard and seen the difficulty.

The parties were near neighbors, and we infer had been for several years past, and the evidence clearly shows that their relations were not at all of a friendly character. Catherine Cutrell, a witness for the People, testifies that some three or four years ago the accused told her that if Eararth did not let him alone he would kill him; that he had repeated this threat several times since, the last time being about six months ago. Mathew Murray, another witness for the People, says: "I had a conversation with the defendant last spring, shortly after I returned from the penitentiary. He (referring to the accused) said, if John Eararth ever bothered him he was going to kill him." To the same effect is the testimony of Madison Peppers. He says: "About three or four years ago I heard the prisoner say he would kill Eararth some time. They had been quarreling. Eararth had accused the prisoner of stealing his garden vegetables." On the other

hand, Charles Woolsey, the same witness heretofore mentioned, swears that some time in the fall before the killing Eararth exhibited to witness and Charles Cutrell, at the house of Eararth, a pole about six feet long, split at one end, with the blade of a butcher knife about seven inches long inserted and fastened in the split, with which he said he was going "to cut Fritz Silgar's heart out if he fooled with him any more." Martin White testifies that Eararth, about six months before the killing, showed him the same instrument described by Woolsey, and said "that he intended to cut Fritz Silgar's head off with it."

Such were the relations of the parties when the deceased and Charles Woolsey, the main prosecuting witness, entered the field of the prisoner, where he was plowing, as heretofore stated. The circumstances which led them to go there, and the purpose or object with which they went, so far as the evidence discloses, are in substance as follows: Some time in the day of the homicide, the wife of Silgar informed Margaret Watkins, and her son, Charles Woolsey, that her husband had driven Eararth's horses out of his field and over the river, and requested them to inform him of that fact. Accordingly, in the evening of that day, they started to the house of Eararth, as the mother says, for the sole purpose of delivering this message, but as the son swears, for the purpose, chiefly, of borrowing some single-trees. They found Eararth some two hundred yards from his house, engaged in splitting rails. Young Woolsey, in giving an account of their interview, says: "I told him that Fritz's wife had told me to tell him that Fritz had driven his horses out of the field and across the river. John said that he would go down and see about it, and if he did not find his horses he would sue Fritz the next day. He wanted me to go with him and show him where the horses had crossed the river, and I went with him. When we found John he was barefooted, and before starting to Fritz's field we went to John's house, and John

got his shoes and put them on, and picked up a hickory stick about two and a half or three feet long, which was lying beside the fire-place, and then we started down to Fritz Silgar's field, where he was plowing. We crossed the fence and went up to where Fritz was laying off corn rows." The mother, in her account of the interview, says: "I told him (referring to Eararth) what Mrs. Silgar had said, and he said he would go right down and see what made Fritz do so. He wanted my boy, Charley, to go along to show him where the horses had crossed, but I objected to Charley going, as I was afraid he would do something to Fritz or Fritz to him, and that my boy might get hurt, and I would not let Charley go until John had promised he would not raise any quarrel with Fritz. They then started to John's house, and I started home."

Resuming the narrative of young Woolsey, which closed with the statement that he and Eararth crossed the fence and went into the field where Silgar was laying off corn rows, he proceeds to say: "I heard the conversation they had, but did not understand it all, as most of the time they spoke German. John said, 'Fritz, what made you drive my horses over the river?' Fritz said, 'They were in my timothy.' Then they talked excitedly in German, and I could not understand what they said. I walked on towards the fence, past a walnut tree, then down the bluff a little, and then came back to the fence and waited, while they talked, and watched them. John started off, and then said, 'I shall look for my horses this evening, and if I don't find them I shall sue you to-morrow.' John was then walking away from Fritz towards me, and was about forty-five yards from Fritz. Fritz said, 'I'll kill you so dead you can't find your horses, damn you,' and leaving his plow he picked up a piece of fence rail, and he run up towards the walnut tree, where John was. I stood with one foot over the fence. I saw Fritz strike John three times with the stick. The first lick John dropped to his knees, and seemed to throw up his hands to ward off the

blow, and said 'enough.'   The next lick 'John fell down flat.
I got scared, and then started across the river."   On cross-
examination the witness is shown a stick, described in the
record as "a heavy hickory club, about two and a half or
three feet long, burned at one end," which he identifies as
the stick which Eararth took from his house with him, and
he further states that Eararth was not in the habit of using
a walking stick,—that he had never seen him use one, and
that he was not a cripple.   He also states, that when Fritz
and John commenced talking, he was afraid, and that he
walked on by the walnut tree towards the high bank; that
he left them behind him, and that they were talking just
tolerably loud; that Eararth threw down his stick before he
was struck.

Blaylock, in giving an account of the affair, says:  "I was
standing near a large tree across the field, and east from the
little walnut tree in Fritz Silgar's field, and about one hun-
dred yards away, I guess.   I saw John Eararth and a little
boy come into the field where Fritz was.   Eararth had in his
hand a stick or walking cane.   He came up to where Fritz
was, and commenced a conversation with him about his
horses.   They talked plenty loud enough for me to hear what
was said.   John said, 'What did you drive my horses over
the creek for?'   I heard Fritz tell John that he would kill
him so dead he would never find his horses.   John walked
on past the walnut tree, and Fritz followed up to the tree.
When he said he would kill him so dead that he never would
find his horses, John turned around and started back, and
Fritz jumped to one side, and grabbed up a club and struck
him.   John threw up his hands, and said he had enough.
Fritz struck one or two more licks, and John fell to the ground.
John threw down the stick before he was struck.   When John
fell, Fritz said something in German I did not understand,
and then he took some water out of a bucket and gave him.
When I saw this I hurried away to get some other persons."

This witness admits; on cross-examination, that he is not on good terms with the accused, and also that he supposed, at the time, the deceased was Mart White.

Mrs. Watkins further states in her testimony, that after parting with her son, Charley, and Eararth, as they started for Silgor's, she had just got home when she heard "a loud noise, as of two persons, in the direction of Fritz's," and upon calling Elias Cutrell's attention to it they both started there on a run; that on getting within about thirty steps of the walnut tree in the field, Fritz ran to it and picked up the club which Eararth had brought with him, and turned to her and Cutrell, "twirling it in his hand," and speaking excitedly in German; that she became alarmed, and ran away; that on her return she found the body of Eararth in the corner of the fence, but a few feet from the walnut tree.

Elias Cutrell, who accompanied Mrs. Watkins over to Silgar's, says, that when he got within observing distance Silgar was sitting on the ground trying to give Eararth water to drink, or was washing his head,—he could not tell which; that when he went up, a short time afterwards, he found Eararth dead.

Dr. Davis, who examined the body of Eararth after his death, testified that he found two wounds on the head of the deceased, and one on his left wrist; that the skull was fractured in one place only; that this wound was sufficient to cause death.

John Stephenson testifies that he saw the body of John Eararth on the 7th of May, 1882, against the fence in the prisoner's field; that it looked like it had been dragged up to the fence; that the creek was just outside the fence.

Martin White testified that the bank of the river for forty or fifty yards south, and sixty or seventy-five yards north, is very steep,—almost perpendicular; that it might be possible for a person to run down the bank without getting into the water, but not probable.

Thomas Logan testified that he had examined and measured distances in the field of the prisoner; that from the walnut tree to the fence on the west side is four steps, and from the tree to where the defendant's horse and plow stood when deceased came into the field is forty-five yards; that the bank near the walnut tree is almost perpendicular for about fifty yards south and seventy-five yards north; that it would be impossible for any one to see what was going on in the level of the field after going down the bank.

Martin White further testifies that the character of the deceased for peaceableness was bad; that he was very quarrelsome, abusive and high tempered, and in this statement he is sustained by other witnesses.

The account of the difficulty given by the accused, in very broken English, is in substance as follows: That on the 7th of May, 1882, near sundown, while laying off corn rows in his field, he saw John Eararth, accompanied by a boy, coming into the field with a club in his hand, (being the same identified by Charles Woolsey,) and that when he came up he said, 'What did you drive my horses over the river for?' when he replied that he had been bothered enough with having his fence torn down and the horses in his timothy; that the deceased thereupon told him if he did not bring his horses back he would beat him over his head till his eyes were out; that he told him he would not bring them back, to which the deceased replied that he would beat him over the head till he was dead, and walked on past the walnut tree; that the accused then stopped his plow, and went under the walnut tree to get a drink of water, where he had some in a bucket; that when he stooped to get the water he saw the deceased coming toward him, with a long stick in one hand and the stick he had brought with him in the other, saying, at the time, 'Fritz, I will kill you;' that he, the defendant, thereupon jumped to the fence and grabbed a piece of three-cornered paling, and as he did so the deceased hit him on

the shoulder with the pole, and then raised the short stick in his left hand as if he was going to throw it, when the accused struck at him to knock the club out of his hand, and in doing so hit his left hand and also his head; that the deceased had his left hand raised, as if in the act of throwing, when this lick was given; that the accused then struck him again over the head, and he fell, and the club beside him; that when he saw he had hurt him he picked him up, and gave him some water to drink, and washed his head, telling him he was sorry for what had happened,—that he did not want to hurt him, but that he had forced him to do it. He further states, that when the fuss commenced Charles Woolsey ran out of the field and down the bank, and could not have seen all that took place, and that the most that was said between them was in German. He also states that Mart White had told him that the deceased had fixed up a knife to kill him with. Moreover, that he had, on a previous occasion, concealed himself behind a tree on the roadside, where witness was passing with his team, for the purpose of assaulting him, but that witness, on discovering him, drove by with such rapidity he did not accomplish his purpose. The prosecution offered some general evidence in rebuttal, tending to impeach the general reputation of the accused for truth.

The foregoing is, in substance, all the evidence in the case, and we may say, that under a deep sense of the responsibility we owe to the State, as well as the prisoner, whose life is involved in the issue, we have faithfully and maturely considered it with whatever of skill or ability we possess, with an earnest desire and purpose to ascertain the real facts and true merits of the controversy which terminated with such fatal results. We have been met, however, at the very threshold of our inquiries, with the conceded fact, if we leave out of view the account which the prisoner himself gives of the affair, that the most that was said on the occasion is not, and never can be, known, by reason of having been

spoken in a language not understood by either of the persons who witnessed the affray and quarrel between them. For aught that appears, the language of the deceased may have been of the most offensive and provoking character, or it may, as testified to by the accused, have consisted of threats against the prisoner's life, which, in view of the existing relations between the parties, may have well aroused in the mind of the accused the most serious apprehensions of danger; and if the taking of the life of the deceased was induced by either of these causes, and was not done in wantonness, or from a mere spirit of revenge, it is clear the killing would not be murder. That the parties at the time were laboring under a high state of excitement is conclusively shown, as already seen, by the almost unprecedented high tone of voice in which they were speaking. Both their voices were distinctly heard by Elias Cutrell and Mrs. Watkins at the latter's house, which the witnesses fix at from four to six hundred yards from the place of the affray, and this must have been immediately before the killing, for, as already stated, Mrs. Watkins swears that upon hearing the quarrel she and Cutrell started in a run to the place, and he swears that when he got in sight, about two hundred yards from the parties, they were down on the ground, and that Silgor seemed to be giving the deceased water, or was bathing his head, so that, at most, but a minute or two could have intervened between the loud quarreling and the giving of the fatal blow. Indeed, neither young Woolsey nor Blaylock, who witnessed the affair, claims there was any intermission in the quarrel. According to all accounts given of it, it must have been a very hasty affair.

But waiving this embarrassing feature of the case for the present, and assuming that in the consideration of it it must be treated just as though what was seen and understood by the witnesses was all there was of it, it is clear the conviction can not be sustained, if it can be sustained at all, except

upon the hypothesis young Woolsey's version of it is the correct one. In several important particulars Woolsey, Blaylock and the prisoner himself substantially agree, and it is important that the extent of this agreement should be distinctly understood and kept in view in considering the real and vital points of difference in their statements. Without going into the details, we may say, in general terms, their several statements, when taken in connection with the uncontradicted testimony of other witnesses, fully establish the following facts: The deceased, being armed with a bludgeon, between five and six o'clock in the afternoon of the 7th of May, 1882, accompanied by Charles Woolsey, entered the field of the accused, where he was plowing; that the latter, upon their coming up, stopped his team about forty-five yards from a walnut tree standing near the fence on the west side of the field, under which the defendant at the time had a bucket of drinking water; that a quarrel at once ensued between the prisoner and the deceased, the latter commencing it; that upon the commencement of the quarrel young Woolsey became frightened, passed on by the walnut tree to the fence, crossed it, and ran down the river bank; that the banks at this point are almost perpendicular, and continue so fifty yards south and seventy-five yards north, so that it would have been highly improbable, if not impossible, for him to have got down the banks within the distances specified without getting into the river; that after the quarrel had proceeded for some time both parties moved in the direction of, and as far as to, the walnut tree, the deceased going in advance and the accused following; that while at or near the tree the accused seized a stick or bludgeon of some kind, with which he struck the deceased as many as two blows, and, as claimed by Woolsey, three, which caused his death; that upon his body were found three wounds, two on the head and one upon the left wrist, only one of the blows causing a fracture of the skull.

So far there is no controversy as to the facts.   It being conceded that the killing occurred at the walnut tree, and that Silgar on leaving his plow only went to that tree, it follows that if Eararth, who immediately preceded him, passed by and beyond the tree, as Silgar and Blaylock both swear he did, he must, at some time between that and the assault upon him, have returned to the tree, which is entirely in harmony with Silgar's account of the transaction, though this important fact is not at all noticed by Woolsey in his testimony, and he may therefore be regarded as impliedly contradicting it.   Silgar says, as will be remembered, that Eararth, on threatening to beat him over the head, etc., walked off, passing by and beyond the walnut tree, and that he (Silgar) then left his plow and went to the tree to get some water, and that while there he discovered Eararth coming towards him in a threatening attitude, whereupon he (the accused) sprang and seized a stick, etc.

Leaving out of view the statement that Eararth was armed in the manner claimed by Silgar, the latter's account of the affair is strongly corroborated by Blaylock.   He says: "John walked on past the walnut tree, and Fritz followed up to the tree.   When he said that he would kill him so dead that he never would find his horses, John turned around and started back, and Fritz *jumped* to one side and *grabbed* up a club and struck him."   How strikingly these two accounts agree in this, perhaps the most important, circumstance connected with the case, and yet there is no express contradiction of it by any one.   The expressions "*jumped,*" and "*grabbed,*" as used by Blaylock, are significant in this connection.   If the deceased, as is claimed by the accused, was at this instant armed with two deadly weapons, and approaching him in a threatening attitude, we should expect that his action under such circumstances, in availing himself of a defensive weapon, would be well expressed by the words "jumped" and "grabbed."   But if, on the other hand, the

deceased was standing quietly by the walnut tree, as is to be inferred from the testimony of Woolsey, it is not reasonable to suppose there would be any occasion to use these terms in describing the action of the accused induced or inspired by such circumstances.

There is another fact corroborative of Silgar's statement as to the circumstances of the assault which we regard as of some significance. It will be remembered he claims that his first lick was aimed at the left hand or arm of the deceased, which was elevated as if he was in the act of throwing a club at him, for the purpose of disarming him and warding off the blow. Subsequently, upon the *post mortem* examination, it turns out there was a wound on the left hand or wrist, which corresponded with the blow which the accused says he gave him.

There are other favorable circumstances which tend to negative the hypothesis that there was any deliberate purpose on the part of the accused to take life. When the fatal blow was given, and his victim fell prostrate at his feet, instead of leaving him to his fate without any apparent remorse or sympathy,—as most men do who deliberately and in cold blood take the life of a fellow being,—he at once commenced deploring and interposing excuses for the act, and applying such simple remedies as were within his power to restore him. Of course circumstances of this character are by no means conclusive, for where the killing is deliberate, and without any considerable provocation, such evidences of a returning sense of humanity and consciousness of responsibility can not avail. But where there are extenuating circumstances, as there manifestly are in this case, such indications are not to be disregarded.

Even accepting young Woolsey's version of the affair without qualification, and rejecting all that is said by both Blaylock and the accused, which, as we have already seen, contradicts him in some vital particulars, the unquestioned

facts are, that the accused had been injured and vexed by the horses of the deceased breaking into his meadow. The deceased had deliberately prepared an instrument of the most deadly character, with which, he declared on several occasions, to different persons, he intended to take the life of the prisoner, and these threats were communicated to him. Thus matters stood when the deceased, armed with a deadly bludgeon, and evidently on no peaceable mission, entered the prisoner's field. The claim that he was going there to learn why the accused had driven his horses over the river was a mere shallow pretense, for he was distinctly told by young Woolsey and his mother he had driven them over there because they had broken into his timothy. The real object of his mission was evidently to provoke a quarrel. His entry for such purpose was wholly unwarranted. He found the accused at home molesting no one, but quietly attending to his own business. He proceeded directly to him with stick in hand, and his only salutation was, "Why did you drive my horses over the river?" when at the same time he knew the reason fully as well as the prisoner did himself. The quarrel thus commenced by the deceased waxed warmer and warmer, their voices growing louder and louder, until they were distinctly heard from four to six hundred yards, when finally the deceased moved off, saying if his horses were not found he would sue the accused on the following day, whereupon the accused, already under a high pressure of excitement, being goaded by this additional threat, seized a stick, the first thing within his reach, and felled his adversary to the ground, inflicting a wound causing his death,—and it is said this is murder. We do not think so. Viewing the case from this aspect, which is the most unfavorable one to the accused which the evidence warrants, we regard it as a case of manslaughter, and nothing more. To say the least of it, there is such a manifest, well-founded doubt of his guilt of murder, as the case is now pre-

sented, as to entitle him to an acquittal on that charge, and the jury should, if they accepted young Woolsey's version of the affair as the true one, have found the prisoner guilty of manslaughter, and not murder. Another trial of the cause may materially change the legal aspects of the case, which may be better or may be worse for the accused. We can not tell.

It is evident from the record before us, that if the examination of the witnesses had been more careful and exhaustive, many material facts might have been drawn out that would have thrown additional light on the subject, which would have relieved the case of much embarrassment. This is particularly true with respect to the cross-examination of the People's witnesses, and affords an additional reason why we would be better satisfied to have the cause submitted to another jury. Had the conviction been for manslaughter only, we should not, at least on the merits, have interposed. In one aspect of the case, as we have already seen, the jury would have been warranted in returning a verdict for that offence; but as the case is now presented there is no theory of it that will justify a conviction for murder.

The judgment, therefore, of the circuit court is reversed, and the cause remanded for further proceedings in conformity with this opinion.

*Judgment reversed.*

Mr. JUSTICE WALKER: I concur in the reversal, but express no opinion on the evidence in the case.