(No. 23954.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LEROY HUNTER, Plaintiff in Error.

*Opinion filed February 18, 1937—Rehearing denied April 13, 1937.*

C. C. CRAIG, and I. N. HERREID, for plaintiff in error.

OTTO KERNER, Attorney General, R. C. RICE, State's Attorney, and A. B. DENNIS, for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

The defendant, LeRoy Hunter, was indicted in the circuit court of Knox county for the murder of Clinton Walker. A jury found him guilty of manslaughter and he was sentenced to the penitentiary for a term of not less than one year nor more than fourteen years. He has sued out this writ of error.

Walker's death was produced by a blow or blows of the fist of the defendant. There is not much conflict over

the material facts. The defendant owned and operated a truck in Galesburg. He occupied a portion of a building on West Losey street. The remainder of the building was occupied by a Mrs. Johnson, her grandfather and her children. The deceased, Walker, lived a short distance away with some of his children. His wife had left him and had instituted a proceeding for divorce in which he had filed a cross-bill. Walker was anxious for a reconciliation and knew that Mrs. Johnson and his wife were very good friends. On several occasions he had induced her and the defendant to accompany him to Knoxville and Peoria in search of Mrs. Walker. Their efforts to locate her were in vain. On the afternoon of July 5, at Walker's suggestion, Hunter and Mrs. Johnson made another trip with him to Peoria in search of Mrs. Walker. They went in Walker's automobile which was driven by Mrs. Johnson. After arriving in Peoria, they had several drinks of beer. It seems that Walker was also drinking gin. Being unable to find Mrs. Walker at the places where they called, they went to East Peoria and then back to Peoria. By this time, Walker was showing the effects of intoxication and was quite quarrelsome. On the return trip, he purchased two cases of beer and some more gin. He ordered the beer sent to Mrs. Johnson's home. It was delivered there but her grandfather refused to let it be brought into the house. However, the party drove by where the beer had been bought and learned of its non-acceptance. It was put in Walker's car and the party proceeded to Mrs. Johnson's home. Walker insisted that the beer should be taken into the house and both Mrs. Johnson and Hunter told him that it could not be done. Mrs. Johnson and the men alighted from the car and Walker became more abusive and called Hunter many vile names.

Lee F. Anderson and his wife and George H. Berry and Mrs. Berry were in Mr. Anderson's back yard. It was beginning to get dark. They were attracted by the loud talk

and quarrelling of the men. They were some distance away and were unable to hear what was said. They saw Hunter pointing his finger at Walker and then they noticed Walker pick up an object about three feet long, which Anderson admitted he had described as a club or pipe, and start toward Hunter. Anderson testified that he yelled "You fellows cut that out" and that Walker dropped the object to the ground, but continued east toward his car where Hunter was standing. Hunter was between the automobile and Mrs. Johnson's dwelling house. When Walker got up close, Hunter hit him with his fist and both engaged in a scramble. Walker went to his knees and Hunter continued hitting him. Anderson further testified that every time Hunter struck Walker his head was knocked against the foundation of the house. After the fight was over, Hunter went into the house and Mrs. Johnson, who had been endeavoring to separate the men, got a pan of water and a cloth and washed Walker's face. In a little while she repeated this act and Walker arose and walked to his automobile. Mrs. Johnson drove him home. The testimony of Mrs. Anderson was similar to that of her husband as was also the testimony of Mr. and Mrs. Berry.

Mrs. Mary E. Lutz, a closer neighbor than the Andersons, did not observe so much of the altercation as did the other witnesses referred to. She saw Hunter striking Walker and Mrs. Johnson's efforts to separate the men. She did not testify to any of the previous facts.

When Walker arrived home from Mrs. Johnson's residence he walked into the house and the record does not show that any one was at home at that time. His son, Homer Eugene, arrived about nine o'clock. Walker was then in the kitchen. His son said he noticed he had been hurt and that his mouth and his whole face was swollen. Shortly afterwards he lay down on the bed. He got up sometime during the night and the next morning his son found him on the porch lying on a comfort. Shortly after

ten o'clock, Dr. Maley was called and after an examination, he prepared some medicine and directed that the patient be permitted to sleep and said he would be all right in about two hours. Later in the day Dr. Howard E. Graham called and Walker was taken to the hospital, where he died about seven o'clock that evening. A post-mortem examination disclosed a large blood clot between the skull and the tissues of the brain on the left side and also a skull fracture. Another skull fracture was found in the base of the skull and a hemorrhage from the middle meningeal artery, which had been ruptured. Dr. Graham stated that death resulted from the ruptured artery.

The defendant testified that the immediate quarrel which provoked the striking arose out of Walker's insistence upon taking the beer into the Johnson home; that Walker called him the vilest of names and was very angry; that the defendant got in the car and was endeavoring to get Walker to go home, but he refused to do so; that Walker finally started around the car and picked up a long bar or gas pipe which had been used for tightening the back wheels on the truck; that Walker said "I'll knock your God damn head off.", whereupon the defendant got out of the car and stood while Walker advanced upon him, that when Walker got close enough the defendant grabbed for the iron pipe with one hand and struck Walker with the other, that the pipe was then dropped and they wrestled around. Walker went to his knees but held on to the defendant; that the defendant continued to strike him and as soon as the defendant got loose he went into the house. He testified that Walker's head did not strike the foundation walls of the house.

Mrs. Johnson's testimony relative to the altercation was similar to that of the defendant's. She described in detail her efforts to separate the men and the defendant's striking Walker in order to free himself.

The only material fact as to which the witnesses differ relates to the time when Walker dropped the iron bar. An-

derson testified that when he called upon the men to cease quarrelling, the bar was immediately dropped. He stated that Walker then started east like he was going to the automobile and when he got to the end of the car, Hunter struck a blow with his fist, knocking Walker to the ground. However, the witness further testified that immediately after Hunter quit striking, he reached over and picked up the bar. If this statement is true, the bar was evidently dropped at the scene of combat and not where Walker was standing when the witness claimed he yelled at the men.

Two neighbors of the deceased testified that during the night of the affray, loud noises were heard in his house as though people were quarrelling and a voice was heard ordering someone out and to stay out. An effort was made to show that Walker was up during the night and that in his intoxicated condition it was possible for him to have fallen from the porch and receive an injury to the back of his head on the steps or walk. This testimony has very little probative force in view of the fact that there is no evidence which tends to show that Walker received any other injuries than those inflicted upon him by the defendant. Nor do we think the question of whether Walker's head hit the foundation of the Johnson home is of great moment. Under both counts of the indictment the material allegation as to the assault is that the defendant struck Walker a violent blow with such force that he inflicted a mortal wound. This fact is established by the evidence without regard to whether Walker's head struck the foundation or not. It is not disputed that the defendant struck the blows and that, as a result, Walker's skull was fractured, an artery was severed and death ensued.

With the facts so well agreed upon, the question in the case is whether or not the defendant was guilty of manslaughter. Under our statute there are two kinds of manslaughter. One is voluntary and the other is involuntary. The evidence here will not support a finding of voluntary

manslaughter. In cases of voluntary manslaughter the killing must be the result of that sudden violent impulse of passion supposed to be irresistible. No such passion was shown in this case. In fact, the very circumstances of the conflict do not indicate that a killing was even contemplated or that it would be the natural result of the defendant's acts.

Involuntary manslaughter may be committed without any intent of killing, provided it was done in the commission of an unlawful act, or of a lawful act, which probably might produce such a consequence in an unlawful manner. A large number of cases have been cited by counsel for the respective parties, two of which are especially significant and applicable to the facts in this case, to-wit: *People* v. *Mighell,* 254 Ill. 53; and *People* v. *Lurie,* 276 id. 630. The facts in *People* v. *Mighell* show that a woman was crossing a bridge at Dixon and was accosted and insulted by one of several men who were on the bridge. She proceeded on her way and on the other end of the bridge she found her uncle to whom she told the circumstance. He crossed the bridge and after locating the offender, struck him in the face with his fist, causing a skull fracture from which he died. The uncle was indicted for murder and convicted of that crime. This court reversed the judgment and remanded the cause on the ground that the evidence showed the defendant was guilty of no more than manslaughter. The blow which caused the death of the deceased, "if unlawful" brought the case exactly within the definition of involuntary manslaughter. The opinion states that it was manifest the defendant had no intention to kill the deceased and that there was not the slightest reason to suppose he contemplated the decedent's death or even any serious injury to him. "The fight which followed was not such an unlawful act as in its consequences would naturally tend to destroy the life of a human being under any conditions reasonably to be anticipated."

In *People* v. *Lurie, supra,* death resulted from a fist blow. The defendant was found guilty of murder and this court cited, with approval, *People* v. *Mighell, supra,* and *Silgar* v. *People,* 107 Ill. 563, and stated that "If the evidence were clear and uncontroverted that plaintiff in error did not use brass knuckles and had no other instrument or thing liable to produce death in his hands at the time, but simply struck or pushed the deceased with his bare hands, then, under the statute as construed by the decisions of this court, on the facts in this case plaintiff in error could only be held guilty of manslaughter."

It is expressly pointed out in *People* v. *Mighell, supra,* that death resulting under circumstances there set forth could be no more than involuntary manslaughter and in order to constitute that crime the killing must have resulted from the commission of an unlawful act or of a lawful act which probably might produce such a consequence, in an unlawful manner. Upon this proposition all authorities agree. The statement of facts in both the *Mighell* and *Lurie cases* indicates that the blows struck by the assailants were not delivered in self-defense, but were unlawful assaults or acts. If so, the crime of involuntary manslaughter was complete, but where blows are delivered in self-defense they do not constitute unlawful acts and no conviction of involuntary manslaughter can be justified.

While we are always loathe to disturb the verdict of a jury in a criminal case, yet we will not hesitate to reverse a judgment of conviction either when the evidence of guilt upon which it is based is of unsatisfactory character or where the law will not permit the enforcement of the judgment. An examination of the record before us shows that the defendant had tried without avail for several hours before the fatal conflict, to pacify Walker; that Mrs. Johnson had used her best offices to subdue his quarrelsome mood; that when he got to her home he insisted against her will on bringing liquor into her house; that he became

so enraged that he applied the vilest epithets to the defendant; that he picked up a deadly weapon and advanced upon the defendant and was repulsed only by the force which nature had provided the defendant. The acts of the defendant were apparently necessary in his own self-defense.

So definite is the proof in support of these conclusions that the judgment is reversed. *Judgment reversed.*