THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BARRY MITCHELL *et al.*, Defendants-Appellants.

(No. 57958;

First District (5th Division)—June 15, 1973.

Julius Lucius Echeles and Frederick F. Cohn, both of Chicago, for appellants.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Kissane and George Michael Keane, Jr., Assistant State's Attorneys, of counsel,) for the People.

Mr. PRESIDING JUSTICE DRUCKER delivered the opinion of the court:

Defendants, Barry Mitchell and Eddie Mitchell, were found guilty of murder after a jury trial. Barry Mitchell was sentenced to 30 to 100 years and Eddie Mitchell to 14 to 20 years. They both appeal.

The following contentions are raised: (1) that the defendants' Fifth Amendment rights to remain silent were violated when police officers testified that they refused to respond to police questioning; (2) that the court erred in failing on its own motion to instruct the jury as to voluntary manslaughter; (3) that the court erred in refusing to submit a tendered instruction as to involuntary manslaughter; (4) that the court improperly limited cross-examination of a prosecution witness; (5) that the evidence was insufficient to support a conviction of either defendant beyond a reasonable doubt; and (6) that the sentence given to Barry Mitchell was excessive.

The State's evidence may be summarized as follows: On March 13, 1971, at about 11:15 P.M., Eddie Mitchell (who was 16 years old) entered the Homestead Tavern and attempted to purchase some beer. Upon being refused service by the bartender he went over to Troy Cline (the deceased) and insisted that the deceased purchase the beer for him. At the time the deceased was drinking with his brother Ronald Cline and others. The deceased refused and Eddie started an argument with him. A few blows were exchanged. Eddie then left the tavern saying that he was going to get his brother (Barry Mitchell) and come back and kill the Cline brothers. He returned to the tavern 15 minutes later and called for the Clines to come outside with him. The deceased became angry and started walking toward the tavern door. Ronald Cline went after him trying to prevent a fight. When they arrived at the door, Eddie began striking them with a radio antenna he had taken off an automobile. Ronald Cline took the antenna away from Eddie and attempted to get him into a car so that they could go to Eddie's brother's tavern to resolve the dispute; he was holding Eddie around the arms and waist but wasn't trying to hurt him; he was just trying to prevent Eddie from inflicting any injury. Barry Mitchell then came on the scene. He approached from the side of the street opposite the Homestead Tavern. When Barry got to the middle of the street, he held up a gun. Then, as Ronald Cline stated:

"I had a hold of Eddie at the time. I don't remember whether I

turned him [Eddie] loose or whether he lurched, * * *, but anyway the shooting started."

Barry Mitchell fired about six shots, one of which killed the deceased. The deceased was holding a set of car keys in his hand at the time. There were about 18 to 30 people on the street. The deceased was 30 years old, six feet one inch, and weighed 175 pounds. Ronald Cline was 26, six feet tall and weighed 185 pounds.

The owner of the Homestead Tavern testifying for the prosecution stated that just prior to the shooting he heard Barry Mitchell holler, "Eddie, duck, I will get him." On cross-examination he was asked if the Cline brothers were good customers of his. He answered, "Yes, sir." The assistant State's Attorney then objected and the objection was sustained. He went on to testify, without objection by the State, that the Clines came to his tavern quite often.

The coroner's pathologist testified that the bullet which killed the deceased entered on the left side of his stomach and lodged in the right side of his back; it was possible that the deceased was turning toward his right at the time of the shot; it did not enter straight on.

Deborah Rogers, Barry Mitchell's girl friend, testified for the defendants. She saw Eddie Mitchell walking on the street some time after 11:15 P.M. Eddie told her that he had been beaten up and asked her to get Barry for him. She then got Barry and told him that "Eddie was getting beat up."

Eddie Mitchell testified in his own behalf. After the initial conflict with the deceased in the tavern, he ran over to Deborah Rogers and told her to get his brother. He admitted that when he left the tavern he told the deceased he "would get [his] brother to kill him." When Barry approached the middle of the street in front of the tavern, "the people were coming out in the middle of the street after us."

Barry Mitchell testified in his own behalf. Debbie Rogers had told him that a "bunch" of men were beating up his brother. As he approached the Homestead Tavern he saw a crowd of 25 to 35 people. His brother was being beaten but got away and ran past Barry. Barry then put the gun into the air "to scare the people." Some of the people began coming toward him. The deceased was first, Ronald Cline was behind the deceased and others behind Ronald Cline. The deceased had a metal object in his hand. Barry panicked and shot the gun "in their direction"; he was not aiming at anyone in particular; he "did not mean to hit" the deceased. He denied ever hollering, "Duck, [Eddie], I'll get him." When the gun was emptied, he fled. He was caught by the police and taken to the police station. His brother's face was swollen.

Carl Smith, a Chicago police officer, testified for the defendants. He

was at the police station when the defendants were brought in. Eddie's face was red and swollen. Defense counsel asked Smith if he had a conversation with Eddie relating to his swollen face. Smith responded that he did and that Eddie said the deceased had struck him. On cross-examination Smith stated that he asked Eddie where his brother and the gun used in the incident were, but that Eddie would not respond. No objections were interposed as to these questions.

During direct examination of John Roberts, a Chicago police officer testifying for the State, Roberts stated (without objection by defense counsel) that after he advised the defendants of their "rights" at the police station, they informed him of their desire to remain silent.

*Opinion*

Defendants first contend that their fifth-amendment rights to remain silent were violated when the prosecution elicited testimony to the effect that they had refused to respond to police questioning atfer being taken into custody.

■■ No objection was made to the questions involved and defendants acknowledge that they may claim error only under the "plain error" rule (Ill. Rev. Stat. 1971, ch. 110A, par. 615(a)) since errors of constitutional dimension like other errors are generally deemed waived by failure to properly object. (*People v. Long*, 39 Ill.2d 40, 233 N.E.2d 389.) Supreme Court Rule 615(a) provides in relevant part:

> "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."

■■ We believe the rule is inapplicable here because the references to the defendants' desires not to respond to police questioning was very brief and not emphasized by the prosecution at any other time during the trial, and the jury was fully informed as to the defendants' version of the incident which did not conflict that greatly with the State's evidence. See *People v. Johnson*, 2 Ill.App.3d 965, 275 N.E.2d 649.

■■ Defendants next contend that the court erred in failing on its own motion to instruct the jury as to voluntary manslaughter. The established rule in this state has been that even if there is evidence justifying the submission of a voluntary manslaughter instruction, the court is not bound to submit such on its own motion. (*People v. Taylor*, 36 Ill.2d 483, 224 N.E.2d 266.) Defendant urges that *Taylor* was overruled by *People v. Joyner*, 50 Ill.2d 302, 278 N.E.2d 756. We disagree. In *Joyner*, unlike *Taylor* and the instant case, a voluntary manslaughter instruction was tendered by the defendant, but it did not fully comply with IPI—Criminal 7.05 which covers voluntary manslaughter. The court held that under the circumstances of that case which it labeled as a "close case factually," fundamental fairness required that the jury be instructed as

to voluntary manslaughter despite the technical non-compliance with IPI—Criminal 7.05. The court made no reference to *Taylor* and we believe did not overrule *Taylor* by implication (see 20 Am.Jur.2d, Courts, § 232, p. 561; *New Amsterdam Cas. Co. v. National Union Fire Insurance Co.*, 266 N.Y. 254, 194 N.E. 745), but merely decided the case based on the precise facts before it. It is settled law that the precedential scope of a decision is limited to the facts before the court. *People v. Arndt*, 49 Ill.2d 530, 276 N.E.2d 306.

Defendant next contends that the court erred in failing to submit a tendered instruction as to involuntary manslaughter. Both parties agree that the issue here is whether there is evidence in the record upon which the jury could have conceivably based a verdict of guilty of involuntary manslaughter. *People v. Bembroy*, 4 Ill.App.3d 522, 525, 281 N.E.2d 389.

■■ We agree with the State that an instruction as to involuntary manslaughter was not justified by the evidence in the record. The theory of defense at trial was self-defense or defense of a third party. It has been held that since self-defense (or defense of a third party) presupposes the intention to kill or cause great bodily harm, said defense is inconsistent with the crime of involuntary manslaughter since the latter offense, by definition, is evidenced by the mental state of recklessness, not intent. *People v. Johnson*, 54 Ill.App.2d 27, 36, 37, 203 N.E.2d 283.

In *People v. Latimer*, 35 Ill.2d 178, 220 N.E.2d 314, the defendant pointed a gun at the deceased after they had an argument. Defendant testified that he was just trying to frighten the deceased; that he did not intend to shoot him; and that he did not know whether the safety of the gun was set. In holding that the evidence did not warrant an instruction on involuntary manslaughter the court stated at 182-183:

> "We have repeatedly held that it is not necessary to show that an accused has formed an intent to kill in order to justify a murder conviction. It is sufficient to show that he voluntarily and wilfully committed an act, the natural tendency of which was to destroy another's life, *with the intent being implied from the character of the act.*" (Emphasis added.)

Under the rule set forth in *Latimer* we believe that the evidence did not show "recklessness" but rather an intent to kill or knowledge that the defendant's acts would cause death or grave bodily harm. The undisputed facts show that Barry Mitchell walked to the center of the street, raised his gun in the air to scare the people and proceeded to fire about six bullets into a crowd of 18 to 30 people and killed one of the individuals who had been fighting with his brother. As was stated in *People v. Gonzales*, 40 Ill.2d 233, 241, 239 N.E.2d 783:

> "[W]here the evidence clearly demonstrates that a killing was

murder the giving of a manslaughter instruction is erroneous."

Defendant cites *People v. Reece,* 123 Ill.App.2d 97, 259 N.E.2d 619, and *People v. Barksdale,* 131 Ill.App.2d 103, 266 N.E.2d 516. In *Reece* the deceased initially pulled out a gun to show the defendant and then fell backward. The defendant then pulled out a gun to scare the deceased, fell backward himself, shot the gun and killed the deceased although he was not aiming at him. This is unlike the instant case where the defendant, although perhaps at first reacting in fear when he raised the gun in the air, proceeded to fire six shots toward a crowd of people. In *Barksdale* the defendant fired one shot toward a car not aiming at anyone but allegedly acting in self-defense. Again, the evidence there supported a conclusion that the defendant acted recklessly without the intent to kill.

■■ Defendants next contend that the court improperly limited cross-examination of a State witness, namely, the owner of the Homestead Tavern. Defendants argue that the limitations on cross-examination prevented them from showing his bias toward the deceased and his brother. We have reviewed the record and conclude that any such limitation was not prejudicial.

Defendants next contend that the evidence was insufficient to support either conviction beyond a reasonable doubt.

First we address the case against Barry Mitchell. Here it is urged that Barry Mitchell's actions were justified under Ill. Rev. Stat. 1971, ch. 38, par. 7—1. It provides:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

■■ Defendant first argues that when he arrived at the scene of the incident, he saw older bigger men holding or beating his brother; that he had been informed minutes earlier by Deborah Rogers that his brother was being beaten; that his brother was the victim of a battery committed on a public way which is an aggravated battery (Ill. Rev. Stat. 1971, ch. 38, par. 12—4(8)), which in turn is a forcible felony. (Ill. Rev. Stat. 1971, ch. 38, par. 2—8.) Assuming for the moment that when Barry Mitchell came on the scene Eddie Mitchell was being held or beaten on the street, this would still not justify his act of firing six shots in the direction of the group of people in the area. Defendant omits the signifi-

cant fact that before he fired even the first shot, his brother had already escaped from the person holding him and had run by him across the street. At this point Barry Mitchell was no longer preventing imminent death or great bodily harm to another nor the commission of a forcible felony.

■■ Barry Mitchell next argues that the use of deadly force was justified because he reasonably believed that such force was necessary to prevent great bodily harm to himself. He relies mainly on the fact that the deceased had a "metal object" in his hand, the inference being that defendant believed this to be a gun. The deceased's brother testified that the deceased was holding car keys in his hand. The coroner's pathologist testified that the bullet did not enter the deceased's body "straight on" and that his body could have been turning away when shot. In short, the issue of whether justifiable self-defense was established was one of fact to be decided by the jury. (*People v. Pearson*, 4 Ill.App.3d 462, 281 N.E.2d 422; *People v. French*, 3 Ill.App.3d 884, 279 N.E.2d 519.) The evidence is not so insufficient as to require reversal.

■■ Next we turn to the case against Eddie Mitchell. His murder conviction resulted from the fact that the jury held him accountable for the acts of his brother. The controlling statute is Ill. Rev. Stat. 1971, ch. 38, par. 5—2, which provides in relevant part:

"A person is legally accountable for the conduct of another when:

\* \* \*

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. \* \* \*."

The State bears the burden of proving the above elements beyond a reasonable doubt. (*People v. Ramirez*, 93 Ill.App.2d 404, 410, 236 N.E.2d 284.) In the instant case the State argues that defendant "solicited" his brother to commit murder. "Solicit" is defined in our Criminal Code as, "to command, authorize, urge, incite, request, or advise another to commit an offense." (Ill. Rev. Stat. 1971, ch. 38, par. 2—20.) The State relies on the facts that when Eddie Mitchell left the tavern after the initial confrontation with the Cline brothers, he vowed to come back and kill them, and that he told Deborah Rogers to get his brother because he had been beaten up. But it is undisputed that Eddie Mitchell never requested that his brother come to the tavern and kill anyone. The fact that he may have wished them dead may indicate that he shared a common intent with his brother, but it has no bearing on the issue of whether there was a "solicitation." As stated in 22 C.J.S. Criminal Law, § 88(2), p. 265:

"Mere suggestion of enmity toward the victom of a crime does not constitute aiding and abetting its commission. Where the assistance is rendered by words of encouragement and incitement, it must be proved that they were addressed to, or heard by, the actual criminal."

See *Quinn v. State,* 20 S.W. 1108 (Tex. Cr. App. 1893).

■■ We find insufficient evidence of accountability to prove defendant Eddie Mitchell guilty of murder beyond a reasonable doubt.

■■ Defendant Barry Mitchell lastly argues that his 30 to 100 year sentence was excessive. He was 20 years old at the time of the offense and his prior criminal record shows a fine of $25 for some undesignated offense and a conviction for possession of marijuana for which he was placed on probation for six months. The latter conviction is void in light of *People v. McCabe,* 49 Ill.2d 338, 275 N.E.2d 407. His shooting the gun into the crowd of people cannot be condoned, but in view of the diminutive nature of his prior criminal record and the fact that the instant killing occurred as a result of Barry Mitchell believing (initially, at least) that he was coming to the aid of his younger brother, we believe the sentence should be reduced to 20 to 60 years. Ill. Rev. Stat. 1971, ch. 110A, par. 615(b)(4).

The conviction of Eddie Mitchell is reversed. The conviction of Barry Mitchell is affirmed as modified.

Reversed in part; affirmed in part as modified.

ENGLISH and LORENZ, JJ., concur.