THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ELMER SINGLETON, Defendant-Appellant.

Third District    No. 74-429

Opinion filed September 9, 1976.

ALLOY, P. J., dissenting.

Robert Agostinelli and Joseph Weller, both of State Appellate Defender's Office, of Ottawa, for appellant.

Robert A. Barnes, Jr., of Lacon, for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

Defendant was indicted and tried by a jury for the offenses of murder, voluntary manslaughter, aggravated battery and involuntary manslaughter. He was found guilty of involuntary manslaughter and was acquitted of the other charges. He appeals his conviction and the sentence to the Department of Corrections for a minimum term of 3 years and a maximum term of 9 years.

The record discloses that Albert Thompson was fatally shot by defendant in Thompson's modified mobile home located north of Chillicothe, on June 22, 1974, at approximately 9:15 p.m. Defendant, who was about 57 years old at the time, and his wife, Virginia, had been friends of Albert and Ruby Thompson for 8 months to a year prior to the shooting. Albert Thompson was 64 years of age at the time of his death.

On the day of the shooting the Singletons had arrived at the Thompson trailer by invitation about noon with a six-pack of beer. The four persons drank beer and socialized for part of the afternoon and then took a drive through the country to see some other friends. While they were at a farm, where some ponies given by defendant to Thompson were kept, the two men began arguing about the ponies, and Thompson said, "You could get killed for that." Shortly thereafter they drove back to the trailer and defendant refused to come in for some time, until Thompson told him to "forget it." Defendant went in, a short time later, however, Thompson suddenly brought up the ponies issue again and produced a knife. There is conflict in the evidence from this point.

Defendant testified that Thompson got up from the couch 2 or 3 feet away and was angry and had the blade of his pocket knife open and said, "I'm going to cut your damn head off," and started at him with the knife. Defendant said he jumped up and pushed his chair back and pleaded with Thompson to put the knife away. He claimed that he threw up his right hand to divert a blow and got cut on his thumb, and that Thompson still came at him and nicked him on the forehead and neck, and knocked his glasses off. Defendant said that he then kicked Thompson, pushed him into a bedroom, and then left the house and went to his car intending to find an extra pair of glasses there, and to go for help. He also testified that while he was outside, he heard the women scream and that fearing for

their safety, he picked up his .22 pistol from under the front seat of his automobile and reentered the house.

Mrs. Thompson testified that she was in the kitchen when she heard her husband suddenly tell defendant to leave. She looked over and saw that her husband was still seated on the couch with his pocketknife partly opened. He could have been cleaning his fingernails with the knife, according to her testimony, because she saw no attempt on his part to injure defendant. She did see defendant leave and assumed he had gone home leaving his wife. Mrs. Thompson stated that when defendant returned to the trailer home with a gun, that her husband retreated to the bedroom and that defendant followed him saying, "You sonofabitch, now I would like to see you cut my throat." Then she heard shots fired in the bedroom. By this time she was on the telephone calling for help, and next saw defendant walk out of the bedroom covered with blood. She stated that she did not know whether the blood she saw was from wounds received by defendant or whether it was from decedent. According to her testimony, defendant said he "was going to have to go to the hospital" and that she told him he was going no place until the police and ambulance could come. She stated that defendant nonetheless walked outside and then came back in saying "I don't own a gun." She also testified that her husband had a reputation for being a nice kind man.

Defendant's version of what occurred when he returned with the gun varied considerably from the testimony of Mrs. Thompson. According to him when he reentered the house, Thompson was standing by the kitchen door and said to him "I'll kill you," and came after him with the knife. Defendant stated that he hit Thompson on the head with the gun and that because of the blood on his hand, the gun slipped loose and fell to the floor. Thompson dropped to the floor for the gun and defendant dropped down on him pinning down Thompson's hand with the knife in it while trying with his free hand to outreach Thompson for the gun. Thompson then pulled his hand with the knife in it through defendant's hand cutting defendant's fingers. They scuffled on the floor into the bedroom where Thompson, having freed his hand with the knife, gouged defendant in the back, hip and stomach. The knife got loose again, and defendant was bleeding; feeling fear and danger, defendant pulled the trigger and saw Thompson go limp. As he came out of the bedroom door, defendant said he saw Mrs. Thompson, told her to call for help and took his gun to the doorway where he pitched it into a field. It was later found by police about 50 feet away. Defendant admitted having told the police that he did not own a gun, but stipulated during trial that the gun found was his.

Mrs. Singleton testified for her husband, but being a victim of glaucoma who could not see well, her testimony was limited to having seen Thompson get up from the couch and cut her husband. She did not see

her husband leave the residence, or return with a gun, but she did admit seeing Thompson head for the bedroom and her husband following him trying to get the knife, and she heard one shot.

Several police officers and the sheriff testified to having taken a statement from Mrs. Thompson and Mrs. Singleton during the investigation on the night of the incident. The women were interviewed jointly and both signed. The officers stated that whether any part of the statement was verbalized by Mrs. Thompson or Mrs. Singleton, neither contradicted the other. The sheriff said, however, that he heard Mrs. Thompson say decedent and defendant got into an argument and that decedent pulled a knife and started cutting on defendant and told him to leave the trailer. Trooper Gary Booth corroborates this version, and Trooper Gene Kizer had reduced the womens' statement to writing, and testified that both ladies signed it. All investigating officers testified they found blood on the right hand outside from door of defendant's car, on the steering wheel, on the front floor, and a smear on the front seat. It also appears clear from police testimony that when Mrs. Thompson reported the incident by telephone, she reported a shooting and a stabbing. There was considerable evidence of defendant's good reputation in the community for being a law abiding peaceful citizen.

The court denied all offers of proof by defendant that decedent had brutally beaten and injured Mrs. Thompson, an invalid, within 2 months of this incident, and that Mrs. Thompson, relating her fear of her husband, would not go to a hospital until defendant persuaded her to; that after hospitalization, defendant had brought her home with police protection, and that Thompson had later threatened to kill defendant with a hammer for having done so. The court also denied an offer of proof through a neighbor of Thompson's, one John Thurman, that decedent was volatile and had made threats on members of his family. The court also denied defendant's offer of proof that he was aware of all the foregoing incidents, and as to decedent's previous criminal conviction for murder, at the time he reentered the trailer with his pistol thinking the women were in danger.

■■ We believe that the testimony tendered with respect to threats and actions of Thompson and defendant's knowledge of Thompson's previous conviction for murder, were not in fact too remote in time to be relevant and admissible. Many of these events were within 2 or 3 months of the actual shooting. Testimony of events more remote in time have been admitted in other cases. (*People v. Stepheny*, 46 Ill. 2d 153, 263 N.E.2d 83 (1970); *People v. Adams*, 25 Ill. 2d 568, 185 N.E.2d 676 (1962).) A defendant claiming self-defense in response to homicide charges may show specific acts of violence and threats by the deceased (*People v. Adams*, 25 Ill. 2d 568, 572, 185 N.E.2d 676 (1962); McCormick on

Evidence §193, at 461-62 (2d ed. 1972)), and should be allowed substantial latitude in making such showing. (*People v. Stombaugh*, 52 Ill. 2d 130, 139, 284 N.E.2d 640 (1972).) The inclusion of the testimony referred to would tend to show justification for defendant's return to the trailer in coming to the defense of his wife and Mrs. Thompson (Ill. Rev. Stat. 1973, ch. 38, par. 7—1), and the exclusion of such proof was prejudicial.

If, as the circuit court apparently concluded there was sufficient evidence to warrant an instruction on involuntary manslaughter, we are also persuaded that reversible error occurred in giving Illinois Pattern Jury Instruction—Criminal No. 7.08 (hereinafter IPI—Criminal) without including therein, as one of the issues which the State must prove beyond reasonable doubt, the fact that the killing was without legal justification. That issue was included in the issues instructions on each of the other charges of which defendant was acquitted. Self-defense is applicable to the charge of involuntary manslaughter. (*People v. Hunter*, 365 Ill. 618, 624, 7 N.E.2d 444 (1937)), and the failure of the court to so instruct was prejudicial and misleading.

■■  The foregoing errors, standing alone, would require remandment for a new trial on the involuntary manslaughter charge. In support of an argument for outright reversal, however, defendant contends that there is no evidence in this record to show the mental state of recklessness, which is an essential element of the charge of involuntary manslaughter of which he was convicted. Accordingly, he argues that IPI—Criminal No. 7.08 should not have been given in any event because the testimony presented, in any manner it may be interpreted, shows an intentional killing, *i.e.*, either murder or voluntary manslaughter or justifiable self-defense, and that there is nothing in the record, even considering only what was admitted, which suggests recklessness. We are persuaded that this argument is correct, and that the rule announced in *People v. Hall*, 118 Ill. App. 2d 160, 254 N.E.2d 793 (1st Dist. 1969), is applicable by analogy. Under the version of facts testified to by Mrs. Thompson, defendant without any justifiable provocation left the house, returned with a gun and followed the retreating decedent to the bedroom where he shot him. Under defendant's version, after having retreated from the scene of personal danger, he deliberately returned with a gun to protect the women, including his wife who had remained there, from an apparently imminent threat of harm. We believe that reversible error was made in submitting an instruction on involuntary manslaughter, and that the conviction on this charge must be set aside. In view of that determination, it is unnecessary to consider other alleged errors.

Accordingly, the judgment of conviction entered by the circuit court on the charge of involuntary manslaughter, and the sentence imposed, is reversed, and the cause is remanded with instructions to vacate the same.

Reversed and remanded with instructions to vacate the judgment and sentence for involuntary manslaughter.

STOUDER, J., concurs.

Mr. PRESIDING JUSTICE ALLOY, dissenting:

I do not agree with the conclusions announced by my colleagues which would result in a reversal without remandment. I conclude that this cause should be remanded for the reasons hereinafter stated.

On appeal in this court, defendant contends that there was no evidence to show the mental state of recklessness which is an essential element of the crime of involuntary manslaughter for which he was convicted. He argues that the testimony presented interpreted in any way, shows an intentional killing, *i.e.*, either murder or voluntary manslaughter or justifiable self-defense and that there was nothing which suggests recklessness. I agree that self-defense normally presupposes the intentional use of force in defense of one's person, and that a conviction of involuntary manslaughter would thus be inconsistent if that was the sole evidence (*People v. Mitchell* (1st Dist. 1973), 12 Ill. App. 3d 960, 965, 299 N.E.2d 472; *People v. Davis* (1st Dist. 1967), 82 Ill. App. 2d 282, 287, 226 N.E.2d 688). Where, however, as in this case, there is a question as to whether the killing was in self-defense, and there was evidence from which the trier of fact could find recklessness, the fact that self-defense is pleaded and contended for by defendant does not preclude a verdict of involuntary manslaughter. *People v. Taylor* (1973), 54 Ill. 2d 558, 561, 301 N.E.2d 273.

In the instant case, the testimony favorable to defendant was that Thompson attacked him with a knife and that he left the premises; that he thereafter obtained his gun from his automobile and returned to the trailer and shot Thompson after Thompson again attacked him. While it would appear from this testimony that Thompson was the initial aggressor and also had again started the struggle when Singleton returned with the pistol, the jury could have concluded that Singleton's action in returning to the trailer with the loaded pistol, after having once retreated to safety, was reckless. Certainly, the brandishing of a loaded gun can be considered reckless, particularly when several people are in the immediate vicinity and also in view of the situation which existed in the trailer with Thompson being armed with a knife and in an agitated mental state. (*People v. Meyer* (3d Dist. 1975), 30 Ill. App. 3d 673, 677, 332 N.E.2d 606; *People v. Tarpley* (4th Dist. 1972), 8 Ill. App. 3d 960, 962, 291 N.E.2d 262; *People v. Bembroy* (1st Dist. 1972), 4 Ill. App. 3d 522, 526, 281 N.E.2d 389.) I recognize that apparently similar circumstances in another case prompted that court to conclude that the homicide was

either murder or justifiable self-defense (*People v. Hall* (1st Dist. 1969), 118 Ill. App. 2d 160, 254 N.E.2d 793). I believe that the better view is to allow the intermediate choice of reckless conduct when there is evidence such as presented in this case. I conclude, therefore, that there was sufficient evidence to support the verdict of involuntary manslaughter and instructions on that issue.

With respect to instructions, defendant first notes that the definition of "reckless" conduct contained in Illinois Pattern Jury Instruction—Criminal No. 5.01, was not given to the jury following instructions pertaining to involuntary manslaughter (IPI—Criminal Nos. 7.07, 7.08). This was contrary to the normal directions suggested in Committee Comments with respect to IPI—Criminal No. 5.01. I note that defendant also did not tender a definition of recklessness. Normally, a failure to tender an instruction precludes the party from complaining on appeal that no such instruction was given. (*People v. Grashoff* (3d Dist. 1974), 21 Ill. App. 3d 282, 315 N.E.2d 209; *People v. Holt* (3d Dist. 1972), 7 Ill. App. 3d 646, 652-53, 288 N.E.2d 245.) Defendant contends that he argued against submitting the question of involuntary manslaughter to the jury and thus could not be said to have waived his objection to the failure to include a definition of recklessness. The record, however, shows that defendant did tender an alternative instruction on involuntary manslaughter. He could also have added thereto a definition of "reckless" conduct as set forth in IPI—Criminal No. 5.01, if he chose, but he did not do so.

I also recognize that waiver by failure to tender an instruction would not preclude the court from considering error in instructions where fundamental fairness in the interests of justice so requires. (*People v. Davis* (1st Dist. 1966), 74 Ill. App. 2d 450, 221 N.E.2d 63; Ill. Rev. Stat. 1973, ch. 110A, par. 415(c).) A defendant, however, in such cases, must show that the error was substantial and prejudicial to him. (*People v. Wright* (3d Dist. 1974), 24 Ill. App. 3d 536, 540, 321 N.E.2d 52.) In absence of a specific definition, courts have held that the word "reckless" is so sufficiently a well-defined term in everyday use as to render harmless, in most circumstances, the failure to instruct the jury with IPI—Criminal 5.01, in an involuntary manslaughter case. (*People v. Brown* (2d Dist. 1973), 9 Ill. App. 3d 730, 293 N.E.2d 1; *People v. Maldonado* (1st Dist. 1971), 3 Ill. App. 3d 216, 278 N.E.2d 225.) I believe that the omission to include a definition of "reckless" would be harmless error in the instant case.

I do find, however, that another argument made by defendant, which relates to instructions, is more substantial, and considered with an error which we believe the court committed in exclusion of certain evidence, constitutes a basis for reversal and a new trial in this cause. Defendant's

contention is that the jury was misled by the giving of IPI—Criminal No. 7.08 (issue instruction for involuntary manslaughter), without including the proposition that the State had to prove the absence of legal justification beyond a reasonable doubt. Certainly, where self-defense or other justification is raised by defendant, the State is required to disprove that claim as part of its case. It was, therefore, necessary to instruct the jury according to IPI—Criminal No. 25.05 which includes the obligation on the State to negate the legal justification raised as a defense, as one of the issues which the State must prove. In the cause before us, IPI—Criminal No. 25.05 was followed as to the issues instructions on murder and both forms of voluntary manslaughter, but *not* as to involuntary manslaughter. Defendant contends that the jury might have been misled to the prejudice of defendant into believing that self-defense was not applicable to a charge of involuntary manslaughter.

Clearly self-defense is applicable to a charge of involuntary manslaughter (*People v. Hunter* (1937), 365 Ill. 618, 624, 7 N.E.2d 444). The State apparently does not argue this issue. The State, however, does contend that the failure to give a proper issues instruction was remedied by giving an instruction on legal justification for the use of force by a defendant (IPI—Criminal No. 24.06), so that the instructions as a whole fully informed the jury as to the applicable law. On the basis of the precedents in this State, however, I do not believe that this is adequate.

In *People v. Wright* (3d Dist. 1974), 24 Ill. App. 3d 536, 541, 321 N.E.2d 52, we held that it was error to give the jury *two* issues instructions on murder, *i.e.*, IPI—Criminal No. 7.02, which does not include the issue of self-defense, and IPI—Criminal No. 25.05, which does. Although the State would distinguish that case, since there were two conflicting instructions there and only one given here, it is apparent that the jury was inadequately instructed on this issue. I do not believe that the confusion on the part of the jury would be any less here than in the *Wright* case to which we have referred, nor do I believe that the incomplete instructions in such situation would be any less prejudicial to the defendant. Another court has recently come to this conclusion, holding that the giving of IPI—Criminal No. 24.06 is not enough to overcome the failure to include the issue of self-defense in the issues instruction, as outlined in IPI—Criminal No. 25.05. (See *People v. Wright* (1st Dist. 1975), 32 Ill. App. 3d 736, 744, 336 N.E.2d 18. This is not the same as the previous *Wright* case but involves a different defendant.) I agree with the contention of defendant on this issue and believe that the court was in error in instructing on this issue, particularly when the court also improperly excluded evidence as we will later outline. On the instruction issue, however, I note that defendant tendered an instruction based on IPI—Criminal 25.05 as an alternative to his claim that involuntary manslaughter should not be

before the jury. While the first part of the tendered instruction was not verbatim from the portion of IPI—Criminal 7.08, which was needed to fill in the blanks in IPI—Criminal 25.05 (and thus not in proper form and properly refused by the court), it was sufficient to preserve the objection on appeal in this court, that self-defense is applicable to an involuntary manslaughter charge and the State has the burden of negating that defense when raised. The latter part of the instruction suggested by defense counsel was patterned on IPI—Criminal 25.05.

Defendant also complains of error in the exclusion of certain offered testimony which related to previous threats and acts of violence on the part of Albert Thompson, directed towards defendant, Thompson's wife and neighbor, John Thurman. Evidence was also tendered to show that defendant had knowledge of the fact that Thompson was on parole after serving time for a murder conviction. The testimony which was offered would have shown that on April 4, 1974, Thompson beat his wife, who was confined to a wheelchair. She was beaten so severely that she was taken to a hospital. Two days thereafter, defendant discovered the incident and reported it to police. As a response to this action by defendant, Thompson picked up a hammer and threatened to kill defendant. The following day, defendant took Mrs. Thompson home from the hospital and asked the police for protection. Defendant later learned that Thompson was on parole for a murder conviction. Defendant offered to show that within three months preceding Thompson's death, Thompson had threatened the life of John Thurman, his neighbor, with a knife. It was stated that Thurman also knew of several incidents, at least one involving Singleton, where Thompson had been argumentative and violent. The trial court did not allow the testimony as tending to show that Thompson was the aggressor in the struggle that ended in his death. The court found that it was too remote in time in view of the general reputation testimony given by Mrs. Thompson, and also by reason of the fact that there were eyewitness accounts of the events immediately preceding the shooting from Mrs. Thompson and Singleton. Mrs. Thompson had testified that her husband had a good reputation for being peaceful and law-abiding, while defendant and Thurman testified to the contrary. Defendant was, however, permitted to testify that within a month before the fatal incident, Thompson threatened to kill him with a knife and a gun.

Ordinarily, a defendant claiming self-defense, in response to a homicide charge, may show specific acts of violence and threats by the deceased. (*People v. Adams* (1962), 25 Ill. 2d 568, 572, 185 N.E.2d 676; McCormick on Evidence §193, at 461-62 (2d ed. 1972).) It is also determined that a defendant should be allowed substantial latitude in making such showing. (*People v. Stombaugh* (1972), 52 Ill. 2d 130, 139,

284 N.E.2d 640.) I believe that the testimony tendered, with respect to threats and actions of Thompson, were not in fact too remote in time, since they were within 2 or 3 months of the actual shooting. The testimony of events more remote in time have been admitted in other cases (*People v. Stepheny* (1970), 46 Ill. 2d 153, 263 N.E.2d 83; *People v. Adams* (1962), 25 Ill. 2d 568, 185 N.E.2d 676). Evidence that Singleton and Thompson were apparently friendly and socialized, in and of itself, did not justify exclusion of evidence of threats or ill will between the parties.

The State argues that any error in exclusion of the evidence was harmless because substantially similar testimony was admitted. The evidence with respect to Thompson's recent attack on his wife appears to have been particularly significant, in view of Singleton's account that he re-entered the trailer with his pistol thinking that the women were in danger. Singleton had a right to come to the defense of others if circumstances so warranted. (Ill. Rev. Stat. 1973, ch. 38, par. 7—1.) Since the jury apparently found defendant's action in returning to the trailer to be reckless, the exclusion of the testimony referred to, which would tend to show justification of his return to the trailer, was prejudicial. By reason of the improper exclusion of testimony referred to, combined with the error in instructing the jury, I believe it is necessary to remand the case for a new trial.

For the reasons stated, I believe the judgment of the Circuit Court of Marshall County should be reversed and this cause should be remanded for a new trial.