THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
STANLEY WELLS, Defendant-Appellant.

Fifth District   No. 81—27

Opinion filed November 1, 1982.

Randy E. Blue and John W. McGuire, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Donald W. Weber, State's Attorney, of Edwardsville (Martin N. Ashley and Raymond F. Buckley, Jr., both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

Defendant Stanley Wells was charged in the circuit court of Madison County with murder, voluntary manslaughter and armed violence, all three charges being based upon the fatal stabbing of Edward Stern in Madison, Illinois, on August 8, 1980. In the defendant's trial, the jury was instructed to consider those three offenses as well as the offense of involuntary manslaughter. The jury returned verdicts of not guilty of murder and voluntary manslaughter and guilty of involuntary manslaughter and armed violence. The court sentenced the defendant to 10 years' imprisonment on the armed violence count only. The defendant appeals and argues that the court failed to instruct the jury, *sua sponte*, that the State must disprove that the defendant's acts were unjustified in order to convict him of involuntary manslaughter and armed violence. He also contends that the evidence introduced at trial does not support a conviction for involuntary manslaughter or armed violence and that his sentence was excessive.

At about 2 a.m. on August 8, 1980, the defendant was at his home, in his pajamas, when he heard loud voices coming from the house of his neighbors, the Sterns. He went to investigate, and found his brother, Jeff Wells, and the Stern brothers, Eddie and Danny. The three had been drinking Jack Daniel's whiskey and cola since earlier that evening. After the defendant arrived at the Stern residence, Jeff Wells departed for the Wells home and the defendant remained with the Sterns.

Eddie and Danny were roughhousing with each other, and the defendant attempted to break up the scuffle. Danny responded by challenging the defendant to fight, and the defendant replied that if he wanted to fight, he would have to do so at the defendant's house. At trial, Danny stated that the defendant's invitation to fight at his house occurred after he suggested to the defendant, who had been "talking loud," to be quiet or leave.

The defendant then departed the Stern residence and went home, where he changed from his pajamas into a pair of jeans and obtained a butcher knife with a seven-inch blade from the kitchen. The Stern brothers followed the defendant to his home, and the defendant came

out of the back door with a knife to meet them. There were several differing accounts of the events that followed, four of which were presented to the jury.

Danny Stern testified that, when he came out of the back door, the defendant appeared to be carrying something behind his back, although Danny could not discern what it was because of darkness. As he approached and moved to within five feet from Danny the defendant said "now talk bad." Eddie then circled around behind the defendant and pushed him in the back. Danny did not know if his brother had anything in his hand when he pushed the defendant. According to Danny, the defendant did not fall, but instead turned and "made a swinging motion" towards Eddie. Danny testified that he did not see the defendant stab Eddie. The next thing he remembered was seeing Eddie's body lying on the defendant's back porch, because, as Danny stated at trial, he blacked out for a period of time which he estimated at 15 minutes.

The remaining versions of these events were offered by the only other surviving occurrence witness, the defendant, who did not testify at trial. Madison County Deputy Sheriff Randall Lamb stated that he arrived at the Wells residence at 2:18 a.m. on the morning of August 8, 1980, where he found the body of Eddie Stern lying on the rear porch. After speaking with Danny Stern, who appeared "highly intoxicated," Lamb decided to take an oral statement from the defendant.

According to Lamb, the defendant told him that he had walked outside with the knife and "kind of waved" it around to induce Danny to go home. He was then hit from behind with something that felt like a brick and as a result of the blow, he fell to the ground. As he fell, he raised his arms to protect his face, and in the fall, the defendant felt that he had cut himself on the left forearm. When the defendant realized that he was bleeding, he went into his house for a paper towel, and as he attempted to go back outside, he discovered Eddie lying on his back steps, bleeding and blocking the door. The defendant informed Lamb that he might have stabbed Eddie when he raised his arms during the fall, but he did not know whether he had done so.

Later on the morning of August 8, the defendant gave two oral statements to Madison County authorities. Both of these were videotaped and transcribed and the tapes were played to the jury. During the first interview, taken at 5:25 a.m. on August 8, the defendant again stated that when he went outside with the knife, he was struck in the back with a brick. As he fell, his right hand, which held the knife, swung back over his right shoulder at the level of his ear. When he hit the ground, he cut his lip. The defendant maintained, as he had

done earlier, that he went back inside when he noticed that he was bleeding, and he first discovered that Eddie was injured when he saw him lying on the back porch, preventing him from opening the door.

In his second videotape interview, taken at 8:59 a.m., the defendant said that he wanted to correct some statements he had made in the earlier taped interview. This time, the defendant recalled that he was carrying the knife at his side, where Danny could have seen it, as he exited the rear door after changing clothes and obtaining the knife. He was struck from behind, and he fell, either making contact with the ground or coming close to doing so. In the fall, he injured his lip and cut himself on the arm. The defendant then ran back into the house with only the screen door closed behind him, set the knife on the sink and washed the blood from his arm. He picked up the knife once again and went to shut the door, where he confronted Eddie and Danny outside the door. He opened the screen door nearly all the way, thrust the knife "back at 'em" and told them "you guys go home before somebody gets hurt." The defendant related in the interview that "Eddie Stern and Danny, they kept moving like *** trying to scare me *** so I just stuck it out a little farther then they, one of them *** I turned my head to look at Danny and I guess Eddie jumped on me *** or was gonna jump on me and I just stuck him."

It was established at trial that the cause of Eddie Stern's death was loss of blood from a stab wound to the heart. That wound was approximately 1½ inches long, ¾ of an inch wide and two inches deep and was described by the coroner's pathologist as "more or less a straight-on wound with no angle to it at all." The coroner's report stated that the weight of the decedent was 180 pounds, and an analysis three hours after death showed a blood alcohol content of .20% and a urine alcohol content of .14%.

The defendant argues that the evidence introduced at trial fails to meet the State's burden of proving beyond a reasonable doubt that his act of stabbing Eddie Stern was unjustified. In support of his position, the defendant notes that because the Stern brothers were intoxicated and because Eddie had struck him with a brick, the defendant believed when they approached his back door that they intended to cause further serious injury to him and that his life was in danger. The defendant maintains that this belief was reasonable under the circumstances as a matter of law. (Ill. Rev. Stat. 1981, ch. 38, par. 7—1.) He contends that his response to this threat, by picking up the knife, partially opening the door and thrusting the knife at the nearest of his two attackers in order to scrape him slightly and scare him away, was entirely justified.

The People respond that there was no evidence presented to support the defendant's claims of self-defense. They assert that the defendant, by advancing upon Danny with a butcher knife, was the aggressor, who was therefore required to withdraw from the confrontation. (Ill. Rev. Stat. 1981, ch. 38, par. 7—4(c).) It is insisted that Eddie was entitled to use force, perhaps even deadly force, against the defendant, since he could have reasonably believed that the defendant intended to stab Danny. Ill. Rev. Stat. 1981, ch. 38, par. 7—1.

■ We cannot accept the State's contentions, for they are based on the assumption that the defendant was the aggressor. As noted above, the evidence conflicted concerning the origins of the confrontation. Danny Stern asserted that the defendant challenged him to fight him at his house, after Danny had admonished him to be quiet. Yet, in all of the defendant's statements, he maintained that it was Danny who had first suggested a fight, and it should be recalled that the Stern brothers followed the defendant to his home. Whether the defendant was actually the aggressor in this case, thus not entitled to use deadly force against Eddie Stern, is a question of credibility properly for the jury. (*People v. Day* (1972), 2 Ill. App. 3d 811, 277 N.E.2d 745.) Moreover, we are also of the opinion that the defendant's testimony regarding his assessment of the threat posed to him by the Sterns is "some evidence" of his belief that deadly force was necessary. (*People v. Lockett* (1980), 82 Ill. 2d 546, 413 N.E.2d 378.) The evidence introduced at trial did therefore raise the issue of justifiable use of force.

■ However, we do not agree with the defendant that the State failed to disprove this defense beyond a reasonable doubt. The evidence shows that the defendant was struck either by Eddie Stern, or possibly by a brick he threw. But, as noted above, it is not obvious who initiated the confrontation. Also, there is no proof that the Sterns were armed in any way while they were on the defendant's back porch, and, in the defendant's second videotape statement, he told the authorities that the Stern brothers remained on his back porch while he went inside to wash the blood from his arm and the butcher knife. These factors indicate to us that whether the defendant's belief in the need to defend himself by stabbing Eddie Stern was reasonable was a question for the jury (*People v. Brophy* (1981), 96 Ill. App. 3d 936, 422 N.E.2d 158; *People v. Henry* (1980), 86 Ill. App. 3d 602, 408 N.E.2d 228), and there was evidence from which they could conclude, as they did, that that belief was not reasonable.

Alternatively, the defendant insists that the State's evidence relating to his mental state at the time of the stabbing proves only that he

acted recklessly, but not that he acted knowingly or intentionally to cause great bodily harm to Eddie Stern. (Ill. Rev. Stat. 1981, ch. 38, par. 12—4(a).) In his second videotape interview, the defendant stated that "I didn't really want to stab him. I did not even think I did until I seen red on his shirt [*sic*]" and that "I just wanted to scare him." When one of the interviewing officers asked him if he intended to cut Eddie Stern "a little bit" to show that he meant business, the defendant replied, "Yeah *** just a little bit, I didn't mean to do like that though *** I meant to just, you know, scrape him, or you know, scare him *** is what I want to do *** is scare him ***." The defendant asserts that this uncontradicted account of his mental state negates any inference that he intended to cause great bodily harm to Eddie Stern, and therefore his conviction for armed violence should be reversed.

■ The People reply that the defendant's statements are not the only evidence of his mental state. They correctly point out that intent may be inferred from the defendant's conduct, since it is presumed that a person intends the natural and probable consequences of his actions. (*People v. Fleming* (1976), 42 Ill. App. 3d 1, 355 N.E.2d 345; *People v. Masterson* (1967), 79 Ill. App. 2d 117, 223 N.E.2d 252.) Here, it is undisputed that Eddie Stern was killed when he received a two-inch-deep stab wound straight to the heart. This evidence is contrary to the defendant's assertion that he did not intend to cause great bodily harm to Eddie Stern and provides support for the jury's verdict that the defendant was guilty of armed violence based on aggravated battery. Additionally, the defendant's second videotape statement, although it disavows the intent to kill Eddie Stern, does not deny that the defendant meant to injure the defendant with the knife, even if only to "scrape" him "a little bit." Consequently, the State's evidence was not insufficient to prove the defendant guilty of armed violence based on aggravated battery beyond a reasonable doubt.

Next, the defendant argues that the jury was improperly instructed concerning his defense of self-defense. The court gave to the jury Illinois Pattern Jury Instructions, Criminal, Nos. 24.06, 24.07, and 24.09 (1968) (hereinafter cited as IPI Criminal), which define justification relating to the use of force in defense of a person, use of force in defense of a dwelling, and an initial aggressor's use of force, respectively. The jury was also provided with IPI Criminal No. 25.05, which stated that, in addition to the elements of the crime of murder, the State must prove beyond a reasonable doubt that the defendant was not justified in using the force which he used.

The court presented to the jury, without objection, IPI Criminal

Nos. 11.20 and 7.08, which are the issues instructions for armed violence and involuntary manslaughter, without language requiring the State to negate the justification of the defendant's acts. Defense counsel did not tender IPI Criminal No. 25.05 for either of these offenses, nor did he assign the failure of the court to give this instruction as error in his post-trial motion. The defendant now contends that the trial court's use of issue instructions without self-defense language, for both armed violence and involuntary manslaughter, constituted plain error under Supreme Court Rule 451(c) (87 Ill. 2d R. 451(c)).

Very recently, the Illinois Supreme Court was presented with a similar issue. In *People v. Huckstead* (1982), 91 Ill. 2d 536, the defendant was charged with murder. At trial, the court presented to the jury IPI Criminal No. 7.02, which is the issues instruction for a murder case in which self-defense is not raised. Defense counsel did not object to this instruction or tender IPI Criminal No. 25.05, nor did he contend in his post-trial motion that this was error. As in this case, the defendant asserted for the first time on appeal that the omission of self-defense language from the issues instruction should be considered as plain error.

Resolving a conflict of long standing in the appellate court, the supreme court held that the instructional error alleged by the defendant should not be considered as plain error in that case. The court stated that the plain error exception to the waiver rule is restricted to the correction of "grave errors" and to situations in which the case is close factually and fundamental fairness requires that the jury be properly instructed. The omission of IPI Criminal No. 25.05 was said not to have been plain error because the jury was given a definitional instruction covering the justifiable use of force in self-defense (IPI Criminal No. 24.06) along with an instruction informing the jury that the burden of proof remained with the State (IPI Criminal No. 2.03), and because the prosecutor agreed with defense counsel in closing argument that the State must show that the killing was not justified. The court stated that the case was not factually close, in part because of several witnesses who heard the defendant express his intention to kill the victim before he actually did so.

As an example of a case involving "grave error" the court referred to *People v. Jenkins* (1977), 69 Ill. 2d 61, 370 N.E.2d 532. In *Jenkins*, the trial court submitted to the jury two separate issues instructions on attempted murder. The instruction tendered by the defendant stated that the People must prove that the defendant was not justified in using the force which he used, while the instruction tendered by the State omitted this proposition. Although the defend-

ant failed to object to the State's erroneous issues instruction, the Illinois Supreme Court held that the giving of that instruction constituted plain error. The court stated:

"Where the instructions are contradictory the jury is put in the position of having to select the proper instruction—a function exclusively that of the court. As far as can be known, defendant might well have been convicted on the basis of the erroneous instruction." 69 Ill. 2d 61, 67, 370 N.E.2d 532, 534.

The People contend that here, as in *Huckstead*, the jury was adequately informed of the State's burden of proof on self-defense, even if not from the issues instructions. We note that in this case, the jury was presented with IPI Criminal Nos. 2.03 and 24.06, as they were in *Huckstead*. It is also pointed out by the People that defense counsel, in closing argument, indicated that, in order to convict the defendant of any of the offenses, the jury would have to find that the defendant did not act in self-defense. He stated:

"Armed violence is another—you have to find he intentionally intended to inflict this wound into the individual. Again, not done in self-defense, not done in self-defense. * * * and, of course, all of these things, even if you find they were done and they were done in self-defense, then, of course, you must find a not guilty verdict."

The prosecutor did not object to these remarks, nor did he refute them in rebuttal.

■ The error which occurred in this case is not exactly like that in *Jenkins*, because contradictory issues instructions were not given on the same offense. This error is also not exactly like that in *Huckstead*, because the defective issues instructions related to fewer than all of the offenses upon which the jury deliberated. In our opinion, it is this latter factor which persuades us to classify this case with *Jenkins* and consider the erroneous issues instructions as plain error, despite whatever curative effects the closing arguments and correct definitional instructions may have had. As the defendant argues, the issues instructions for murder in this case stated that the State had the burden of proving that the defendant's actions were unjustified in order to convict him of that offense. The conspicuous absence of that factor in the issues instructions for armed violence and involuntary manslaughter would lead a diligent jury to conclude that, although absence of justification was required to prove murder, it was not required to prove involuntary manslaughter and armed violence. The defendant may well have been convicted of those two offenses because the issues instructions omitted any reference to self-defense.

Therefore, under the facts of this case, we hold that the result in *Jenkins* should obtain and the erroneous issues instructions should be considered as plain error. (See also *People v. Nugin* (1981), 99 Ill. App. 3d 693, 425 N.E.2d 1163.) Also, even if we did not deem this defect to be a "grave error" warranting relaxation of the waiver rule, we believe that this case is factually close so as to justify the use of the plain error doctrine.

The People reply that, even if the improper instructions should be considered by this court, the defendant could not have been prejudiced by the instructions, as there was no evidence produced at trial to support defendant's defense of justification. We have previously rejected this interpretation of the State's evidence. The issues instructions on armed violence and involuntary manslaughter were certainly erroneous (*People v. Ortiz* (1978), 65 Ill. App. 3d 525, 382 N.E.2d 303), and that error is not rendered harmless by the testimony presented at trial.

Finally, the People insist that it was not error to fail to include the element of lack of legal justification in the issues instructions for involuntary manslaughter because justification is not a "necessary element" of that offense. In support of this contention, they refer to *People v. Suerth* (1981), 97 Ill. App. 3d 1005, 423 N.E.2d 1185. As authority for this proposition, the court in *Suerth* cited *People v. Ortiz* (1978), 65 Ill. App. 3d 525, 382 N.E.2d 303. But in *Ortiz*, the court, although recognizing that justification is not a necessary element of involuntary manslaughter (*People v. Pettis* (1974), 23 Ill. App. 3d 623, 320 N.E.2d 194), held that the failure to give IPI Criminal No. 25.05 as part of the issues instruction on involuntary manslaughter was indeed erroneous.

■ The citation of *Ortiz* in *Suerth* may only have been for the statement that justification is not a necessary element of involuntary manslaughter. Nonetheless, the conclusion in *Suerth* that the failure to instruct on self-defense in connection with involuntary manslaughter is not error is not supported by authority. We find that the rule announced in *Ortiz*, in addition to being consistent with other case law (*People v. Singleton* (1976), 41 Ill. App. 3d 665, 354 N.E.2d 464), more effectively implements the defendant's right to accurate jury instructions. Whether the evidence introduced at trial establishes that the defendant acted recklessly or in self-defense is generally a factual question (*People v. Woods* (1980), 81 Ill. 2d 537, 410 N.E.2d 866; *People v. Taylor* (1973), 54 Ill. 2d 558, 301 N.E.2d 273), consideration of which by the jury would be significantly hindered by the omission of self-defense language from the issues instruction for involuntary man-

slaughter. Consequently, we follow *Ortiz* and *Singleton* and hold that such an omission is reversible error where there is sufficient evidence to support the theory of self-defense.

Because the failure to include a self-defense proposition in the issues instructions for involuntary manslaughter and armed violence deprived the defendant of a fair trial, because this defect in the instructions constituted plain error in this case, and because that error was not rendered harmless by the evidence introduced by the State at trial, we must reverse defendant's convictions and remand this cause to the circuit court of Madison County.

Reversed and remanded.

KARNS, P.J., and JONES, J., concur.