(No. 44591.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. DARYL STOMBAUGH, Appellant.

*Opinion filed May 22, 1972.*

RYAN, J., UNDERWOOD, C.J., and SCHAEFER, J., dissenting in part.

FREDERICK F. COHN , of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and PHILIP G. REINHARD, State's Attorney, of Rockford (JAMES B. ZAGEL, Assistant Attorney General, and DANIEL D. DOYLE, Assistant State's Attorney, of counsel), for the People.

MR. JUSTICE DAVIS delivered the opinion of the court:

This case requires a determination of: the propriety of the trial court's refusal to give instructions based upon the defense of a dwelling and to permit the defendant, who asserted the defense of self-defense, to testify as to his state of mind; the sufficiency of the evidence to convict the defendant of the offense of murder beyond all reasonable doubt; and whether the defendant was denied a fair trial by reason of improper final argument by the State.

A jury in the circuit court of Winnebago County found the defendant guilty of the murder of LaVerne Giley. Judgment was entered on the verdict, and he was sentenced to the penitentiary for a period of 14 to 20 years.

The defendant's principal employment was in the

maintenance, repair and installation of instruments for industrial testing of electronic equipment, but he was also a part-time dance instructor at the Arthur Murray Dance Studio. He went to work there about 1:00 or 2:00 P.M. In the latter part of May, 1969, he met Brenda Giley, also a dance instructor at the studio. She and her husband, LaVerne, were having marital difficulties.

Brenda and LaVerne were married in August of 1965, and one daughter, Malocca, was born of their marriage. Brenda filed suit for divorce in April of 1966. She did not proceed with that action, but she and LaVerne were intermittently separated on many occasions. In June of 1969, she again filed complaint for divorce on the ground of cruelty, which set forth instances of physical cruelty on the part of LaVerne toward her.

The defendant first met LaVerne Giley one evening in May of 1969, when Giley came to the dance studio and Brenda ran from him and asked others not to let her husband get to her or hit her. LaVerne waited for her in the parking lot and would not leave, even when police were summoned. On this occasion, Brenda went away with another lady dance instructor, and did not go to her own apartment.

On June 13, 1969, upon leaving the dance studio, the defendant drove Brenda to her car. LaVerne drove up behind them and would not leave. The defendant then started to drive Brenda to her mother's house. LaVerne followed in his car, attempted to force the defendant's car off the road and yelled that the defendant had better stop before he (LaVerne) killed them all. The defendant stopped in the emergency parking lot of a hospital where it would be light and where people would be present. LaVerne opened the car door, tried to pull Brenda from the car and hit her. The defendant exhibited a gun and LaVerne backed off. The defendant and Brenda then reported the incident to the police. Brenda thereafter kept the gun in her apartment for protection.

On June 15, when the defendant was driving Brenda to her mother's house, he noticed LaVerne nearby in his car. They drove by, and he followed them, and tried to force them off the road. At a red light, LaVerne pulled up, ran in front of the defendant's car and pulled the wire from the distributor, causing the car to stop. He insisted that Brenda go with him. She agreed, if she could drive. She started to drive, and LaVerne started hitting her and swearing at her.

On June 17, LaVerne again attacked Brenda. She called the defendant and told him what was happening. He told her to call the police. LaVerne grabbed the phone and started swearing at the defendant. LaVerne then followed Brenda to her mother's house. Brenda again called the defendant and LaVerne grabbed the phone and threatened to kill him. A similar incident occurred the following day.

On another occasion when the defendant was leaving the dance studio, LaVerne appeared and started questioning the defendant. Brenda was not present. LaVerne became angry and rushed at the defendant, who closed and locked a door to protect himself. At another time, when the defendant and Brenda were leaving work, LaVerne followed them. When they stopped in traffic, LaVerne got out of his car, ran to the defendant's car, and struck the defendant in the face. The defendant was able to pull away and drove to the police station.

On June 16, an injunction was issued in the pending divorce proceeding enjoining LaVerne from striking or harming Brenda. At the time of the hearing, LaVerne wanted to know where Brenda was living, but neither Brenda nor her attorney would tell him because of fear for her safety. Brenda tried to conceal knowledge of the location of her apartment from him. On July 11, LaVerne had the right of visitation with their small daughter, Malocca. He made Brenda bring her to a pool hall, and she was to pick her up the following day. LaVerne did not keep his commitment relative to returning Malocca to

Brenda and when she finally got the child on the following day, she and LaVerne had an argument. He indicated that he knew where she lived.

Brenda had asked the defendant to be at her apartment on that day. She told the defendant of her fight with LaVerne. Brenda, Malocca and the defendant had dinner and then watched television. LaVerne knocked at the door, asked for the keys to a car and other articles, and also wanted in. Brenda opened the door slightly, but left the safety chain lock on. LaVerne insisted that he be admitted. Brenda threatened to call the police and her lawyer, but there was no phone in her apartment.

LaVerne kept asking if the defendant was there, and became angrier and angrier. In answer to LaVerne's questions, Malocca indicated to him that the defendant was there. LaVerne then cursed the defendant and angrily threatened harm to him; he got his arm through the door opening and Brenda hit it with an umbrella. The defendant then went to the kitchen cabinet and got the gun he had given to Brenda. LaVerne pushed on the door with sufficient force to break the safety chain lock and rushed into the apartment. At this point he was shouting, "I'll kill him."

The defendant retreated with the gun pointed at LaVerne and told him to get out or he would be in real trouble, but LaVerne kept on advancing and tried to kick the defendant. He hit the defendant in the face and came at him with arms raised as though he was going to choke or hit him. It was then that the defendant shot LaVerne three times. Only seconds had elapsed from the time LaVerne broke through the door until he was shot.

The defendant testified that LaVerne had "rage in his eyes" when he came at him, and that the gun was pointed right at LaVerne and he had to see it. He further stated that LaVerne would not stop advancing, that he retreated to the wall, and that he thought that LaVerne was going to choke him, or hit him, and at that time he shot him.

Both Brenda and the defendant testified that even though shot three times, LaVerne ran out of the apartment. Next morning he was found on the lawn outside of Brenda's apartment about 75 feet from the door. He had died of the gunshot wounds.

Part of the defense in the trial was based upon section 7–2 of the Criminal Code (Ill.Rev.Stat. 1969, ch. 38, par. 7–2) which provides:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry into or attack upon a dwelling. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if:

(a) The entry is made or attempted in a violent, riotous, or tumultuous manner, and he reasonably believes that such force is necessary to prevent an assault upon, or offer of personal violence to, him or another then in the dwelling, or

(b) He reasonably believes that such force is necessary to prevent the commission of a felony in the dwelling."

The court refused to give I.P.I. Criminal Instruction 24.07, based upon the affirmative defense under section 7–2. It appears, from the statement of the trial court, that the tendered instruction was refused on the theory that it was applicable only where force is used to prevent an entry into a dwelling, but not after an entry has been achieved. We are of the opinion that the tendered instruction should have been given, and that the failure to do so constituted reversible error.

The defendant was the guest of Brenda, the tenant of the dwelling. The statute in question is for the benefit of such guest, as well as the tenant or occupant of the dwelling. *(Hayner v. People (1904), 213 Ill. 142, 150, 151; Reins v. People (1863), 30 Ill. 256, 275;* Committee Comments to section 7–2, S.H.A., ch. 38, par. 7–2; 40 Am.Jur.2d, Homicide, sec. 177.) The deceased here made his entry into the apartment and immediately proceeded to attack the defendant. The defendant testified that he shot him a few seconds after he had broken into the

apartment. This was corroborated by the testimony of the witness who lived in the apartment immediately above where the shooting took place. The witness testified that he heard the door being forced open and almost immediately thereafter three shots were fired.

Section 7—2 of the Criminal Code refers to the justifiable use of force "to prevent or terminate" another's unlawful entry into the dwelling. It further states that the use of force which is likely to cause death or great bodily harm is justified only if the "entry is made or attempted" in a violent, riotous or tumultuous manner and if the person reasonably believes that such force is necessary to prevent an assault on or violence to him or another person in the dwelling.

We recognize that there are jurisdictions in which it is held that justifiable use of force in defense of a dwelling is inapplicable once an unlawful entry has been accomplished. *(State v. Brookshire (Mo. 1962), 353 S.W.2d 681; Taylor v. State (1925), 27 Ariz. 228, 232 P. 552.)* Such distinction, unless justified by the wording of the statute involved, seems without support in reason, and is not compatible with our statute which justifies force to prevent or terminate another's unlawful entry into his dwelling.

Section 7—2 provides that a person may use force against another to prevent an unlawful entry into his dwelling. This authorized use of force is somewhat earlier than in comparable situations. Thus, one may use force to *prevent* an entry into a dwelling, where force would not otherwise be condoned. But the benefit of the statute does not cease once the intruder has crossed the threshold into a person's dwelling. The right to use force under the circumstances specified is equally applicable after the unlawful entry has been accomplished. A person not in a public place, but in the privacy of his dwelling or that of another, has the right to use force to prevent or terminate an attempted or actual unlawful entry on the part of

another. This right extends beyond the point of the threshold of the dwelling. The statute permits the use of force if the unlawful entry is "attempted" or "is made."

In *People v. Eatman (1950), 405 Ill. 491,* we construed a prior statute, not as broad as the present section 7–2, pertaining to the right of a person to commit homicide in defense of his habitation. We held that statute to be applicable to a situation where an intruder had completed entry into an apartment. That statute referred to the defense of habitation against persons "who manifestly intend and endeavor, in a violent, riotous and tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein." While the evidence in *Eatman* was conflicting, it suggested that the defendant struck the fatal blow in his kitchen, after the deceased had made unlawful entry into the apartment. The court indicated that it made little difference whether the blow was struck inside the kitchen or in the vestibule since both places were within the apartment of the defendant. This court stressed that the important thing was that a person is entitled to the benefits of the statute while within the confines of his dwelling.

In *Eatman,* at page 498, the court stated: "As a matter of history, the defense of habitation has been the most favored branch of self-defense from the earliest times. Lord Coke, in his Commentaries, says: 'A man's house is his castle—for where shall a man be safe if it be not in his house?' (3 Institute, 162.) And in Pandects, long before Coke, it is stated 'One's home is the safest refuge for every one.' Coke's statement is directly held to be the law of Illinois in *Davison v. People, 90 Ill. 221.* The decisions of our court, and indeed our statute, are but a restatement of the ancient law of England, which became the law of this country in 1607. As a matter of fact the statute in its present form has been little changed since 1827, when it was first enacted. *** We think it may be

safely laid down to be the law of this State that a man's habitation is one place where he may rest secure in the knowledge that he will not be disturbed by persons coming within, without proper invitation or warrant, and that he may use all of the force apparently necessary to repel any invasion of his home."

Under section 7—2 of the Criminal Code, the use of force which is likely to cause death or great bodily harm is permissible if the entry is made or attempted in a violent manner and the defendant reasonably believes that such force is necessary to prevent an assault upon him. We have set forth the facts herein, essentially, as asserted by the defendant. The jury, under proper instructions, might legitimately have so found the facts, and the defendant was entitled to have the jury instructed on the law applicable to his theory of the case. The failure of the court to so instruct the jury constituted error prejudicial to the defendant. *People v. Scott (1948), 401 Ill. 80, 86; People v. Matter (1939), 371 Ill. 333, 338.*

The defendant contends that there was not sufficient evidence on which to convict him of the charge of murder beyond all reasonable doubt. However, the jury, after hearing the conflicting evidence, so found. We agree with the appellate court that the jury was not required to accept the exculpatory statements of the defendant or the testimony of Brenda as true, but could consider such testimony in the light of all the evidence. By virtue of our conclusion on the issue of defense of a dwelling, we have not stated all of the additional facts elicited by the State, some of which are set forth in the opinion of the appellate court. However, after reviewing the complete record, we are of the opinion that there was sufficient evidence for the jury to find that the defendant was guilty of murder beyond a reasonable doubt. *People v. Ostrand (1966), 35 Ill.2d 520, 532, 533; People v. Huff (1963), 29 Ill.2d 315, 320.*

Since this case must be remanded for a new trial, we

note that where, in a prosecution for homicide, an accused relies upon self-defense and evidence has been introduced from which the jury could believe that the deceased was the assailant, then evidence concerning the violent temper and disposition of the deceased and his prior threats to the defendant is admissible as tending to show the circumstances confronting the defendant, the extent of his apparent danger, and the motive by which he was influenced. Such circumstances are relevant in that they tend to show the defendant's state of mind. *(People v. Davis (1963), 29 Ill.2d 127, 129, 130; People v. Arcabascio (1946), 395 Ill. 487, 500, 501; People v. Biella (1940), 374 Ill. 87, 89.)* In this area of proof, the defendant should be given substantial latitude. As to any improper argument on the part of the State, it is probable that such circumstance will not recur at a future trial.

For the reasons stated herein the judgments of the appellate and circuit courts are reversed and the cause remanded for a new trial.

*Reversed and remanded.*

MR. JUSTICE RYAN, dissenting in part:

Rather than reverse and remand for a new trial as the opinion of the court concludes should be done, I would reverse the conviction of the defendant, as I am of the opinion that the evidence is insufficient to sustain a verdict of guilty.

A court of review will attach great weight to the findings of the trier of fact; however, these findings are not conclusive. It is incumbent upon the prosecution to prove the defendant's guilt beyond a reasonable doubt. It is therefore the duty of the reviewing court to examine the evidence to determine whether this burden has been sustained. *(People v. Butler, 28 Ill.2d 88, 91; People v. Dawson, 22 Ill.2d 260, 264; People v. McGee, 21 Ill.2d 440, 444.)* When the evidence is not sufficient to remove all reasonable doubt of defendant's guilt and to create an abiding conviction that he is guilty of the crime charged, it

is the duty of the reviewing court to reverse the judgment. *People v. Reese, 34 Ill.2d 77, 80; People v. White, 26 Ill.2d 199, 203; People v. Qualls, 21 Ill.2d 252, 257; People v. Wilson, 1 Ill.2d 178, 188; People v. De Stefano, 23 Ill.2d 427, 431-432.*

Considering the testimony of the State's witness, it is clearly established that the decedent violently broke into the apartment and was shot within a matter of seconds thereafter. The police officers testified that the door had been forced open with such violence that the screws holding the chain lock were torn from the wood. A man who was in a nearby apartment testified for the State that the decedent had stopped at his apartment and asked if Brenda Giley lived in the apartment house. A few minutes thereafter he heard a commotion like a door being forced open and then heard three shots which followed in a matter of less than five seconds. This evidence produced by the State supports the version of the killing as given by the defendant and Brenda. The appellate court referred to the fact that the defendant and Brenda made no effort to contact the police after the shooting. It also referred to the fact that the pathologist gave as his opinion that it would be impossible for the decedent to stand on his feet or run any distance after he had been shot, whereas the body was found at a spot where the decedent would have had to descend a flight of stairs and travel another 75 feet. I do not consider these facts as contradicting the defendant's position which had to a great extent been corroborated by the State's evidence. The State had the burden of proof and I do not consider the evidence sufficient to remove all reasonable doubt from my mind as to the defendant's guilt and to create an abiding conviction that he is in fact guilty of murder.

I would therefore reverse the conviction of the defendant without remanding the cause.

UNDERWOOD, C.J., and SCHAEFER, J., join in this partial dissent.