THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* AUGUSTIN CARBAJAL, a/k/a Augustina Ayala, Defendant-Appellant.

First District (5th Division)   No. 77-1965

Opinion filed December 8, 1978.

Ralph Ruebner and Susan McElroy, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Mary Ellen Dienes, and Timothy D. McMahon, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Defendant, Augustin Carbajal, was charged by information with the offense of murder in the shooting death of Reuben Hernandez. (Ill. Rev. Stat. 1973, ch. 38, par. 9—1.) Following a bench trial, defendant was found guilty and sentenced to 14 to 20 years. On appeal defendant

contends that he was denied his right to present a defense because the trial court did not allow him to introduce evidence of past acts of violence by the deceased toward his family to explain his state of mind at the time of the incident. We affirm. The facts are as follows.

Prior to trial, the prosecution filed a motion *in limine* to preclude the defense from introducing evidence of the reputation for violence and prior criminal record of the decedent. The prosecutor contended that such evidence was admissible only where defendant introduced evidence of self-defense and of aggression by the deceased. He further argued that the preliminary hearing transcript contained no preliminary showing of an act of aggression by the deceased. Defendant contended that the acts committed by the deceased and the threats against the life of defendant and his family were relevant to his defense of necessity and self-defense. After hearing argument, the court reserved ruling on the motion until such time as evidence of self-defense was presented at trial.

At trial, two eye-witnesses to the shooting testified for the State. On April 17, 1976, at about 3 p.m., Deborah Nash was sitting on her back porch with her then fiancé Gerald Nash. They heard the sound of shots being fired, coming from the direction of the parking lot area alongside of a nearby apartment building. As they looked to see where the shots came from, they observed two men run around the corner and another man following with a handgun. The man holding the gun, whom the Nashes later identified as defendant, fired at least twice and the man who was shot stumbled. After the latter stumbled, defendant fired two more shots and the man fell in the yard south of the building. Neither Gerald nor Deborah saw a weapon in the hands of the victim or his companion. Gerald observed defendant stop running, look at his victim and at the Nashes, turn and run back in a northerly direction in the alley. Gerald and Deborah then went to the yard to look at the victim.

Tom Morrison, a detective of the Harvey Police Department, testified that he received a phone call at the station at approximately 5 p.m. from Nate Johnson, who informed him that defendant had entered his place of business with a weapon and that he demanded to be hidden. Morrison instructed Johnson to place defendant in a vehicle and to drive south on Park. At 164th and Park, Morrison stopped the vehicle and observed defendant in the vehicle with a revolver protruding from his right pocket. Morrison searched defendant, found three spent shell casings on his person, and seized his weapon.

Nicholas Faklis, an Assistant State's Attorney of Cook County, testified that on April 17, 1976, after advising him of his rights, he took a statement from defendant and that Blanca Lara, an official court reporter from his office, translated for defendant. He further stated that in his

opinion defendant was not intoxicated at the time of his interview on the evening of his arrest.

Lara testified that on April 17, 1976, Faklis gave defendant his Miranda rights by telling them to her in English and she then translated them to Spanish. Defendant stated that he understood his rights. She testified that in his statement, defendant said that on the day of the shooting the deceased had visited his home, and left. Subsequently, the deceased returned and knocked on defendant's door. He opened the door and the deceased and his friend entered the room and started swearing at him and saying things that he interpreted as "putting his manhood down." The deceased ran out the door and defendant ran after him while armed with a gun that he had hidden in his pocket. Defendant chased the deceased and his friend across the street and into a parking lot while firing his gun. He stated that he knew he had hit the deceased a few times and that he felt that it was the right thing to do. He further said that there had been a feud between the families of defendant and the deceased and that the deceased had shot his uncle.

Lara further testified that she did not believe that defendant was intoxicated at the time of the statement. She also stated that she did not transcribe defendant's statement because she could not interpret and transcribe at the same time. At the close of her testimony, the State rested its case.

Defendant, through an interpreter, testified in his own behalf. He stated that he had known the deceased, Reuben Hernandez, since childhood and had seen him on April 16, 1976, the night before the shooting. The following day he was in his yard, watering plants, when he saw the deceased again, passing by in an automobile. The car stopped in the parking lot of a tavern and the deceased remained in the car, looking toward defendant's house. Later that afternoon, defendant left his home to go to the store and saw the deceased standing behind a car in the parking lot with a group of friends. The deceased told him that he was a "dead man." Subsequently, defendant went to the apartment of his cousin, Manuel Ayala, where he obtained a gun. Defendant then returned to the parking lot and said to Hernandez, "Let's see who will run back." The latter went into his car, took something out of his pocket, faced defendant and ran from the parking lot. Defendant did not know what the deceased had removed from his pocket. As the deceased fled, defendant fired his gun at him. The deceased was joined by a companion and defendant fired three or four more shots. While defendant was chasing the two men, he heard two shots behind him. He stopped running at the corner of the building near the alley. He then went to the store where he called his home in order to tell his wife to leave the house. Thereafter he began to drink and did not remember anything after that

time. He stated that he killed Hernandez because he thought Hernandez was going to kill him.

Defendant was asked by his counsel whether he had any conversation with the deceased before the day of the killing, but the prosecution objected pursuant to grounds in their motion *in limine* in that there had been no showing of any act of aggression by the victim which would raise a claim of self-defense. Defense counsel then made an offer of proof that he was seeking to establish that defendant had reason to believe, upon seeing the deceased get out of his car that, based on past actions, his wife would be raped with his children watching. The past actions involved the deceased carrying on a one-sided vendetta against defendant's family for 13 or 14 years. Further defendant believed that the deceased was looking for him and his family in Harvey to continue this vendetta. Because of this knowledge and threats the deceased had made the night before, defendant believed the deceased would kill him and his family. In addition, the deceased had told him that he was a "dead man" and he believed it necessary to protect his life and those of his family members by killing the deceased. The court ruled that defendant would be allowed to testify regarding events of the day before the incident to show his state of mind but that he would not be allowed to testify to events prior to that date.

Defendant continued his testimony by stating that on the night before the incident the deceased and his cousin had visited him at his home. The deceased told him that he would kill him and his family. He told the deceased to leave his home to which the deceased responded that he would come back and that he would take his time but would eventually do what he threatened. Defendant testified that he had known the victim in Mexico and had last seen him a year or two ago and that his conversation with family members on the day before the incident informed him that the deceased was in Harvey and that deceased had intentions of killing defendant and his family. When defendant was asked if he knew of the deceased's prior acts of violence in Mexico, the prosecution objected that such matters fell within the grounds of the motion *in limine*. Defendant's counsel then made another offer of proof stating that defendant would testify that he had two uncles killed by the deceased and a niece raped by him. After these crimes defendant left Mexico and received reports from friends regarding the deceased. His cousin, Manuel Ayala, found out that the deceased was in Harvey looking for defendant. When defendant left his home the next day and after the deceased called him a "dead man," his state of mind was such that he felt he had to kill him.

On cross-examination defendant testified that he intended to shoot the deceased. He also stated that he observed something in the deceased's

hand but that he did not check whether the deceased was carrying any weapons. He admitted that after he shot the deceased he continued chasing him. He continued firing the gun and again hit him.

Manuel Ayala, defendant's cousin, testified that the last time he had seen Hernandez before the incident was the evening before when Hernandez knocked on his door. He told him to leave. The next day he saw Hernandez in the parking lot of a bar. He identified the gun that had been introduced into evidence as the gun he had kept in his wife's bureau and said that he did not know that it was missing until the day after the incident. Defense counsel inquired as to whether he had seen the deceased in Mexico in 1972, but objection pursuant to the court's ruling on the motion *in limine* was sustained. An attempt was made by defense counsel to introduce into evidence the criminal record of the victim but the court denied admission of this evidence.

The defense called no other witnesses and after hearing arguments of counsel, the court found defendant guilty of murder.

OPINION

Defendant's sole contention on appeal is that he was denied his right to present a defense when the trial court improperly excluded evidence of past acts of violence by the deceased towards defendant's family to explain his state of mind at the time of the incident. We cannot agree.

Before trial the prosecution filed a motion *in limine* which sought to prevent defendant from introducing evidence of the decedent's alleged prior acts of violence against defendant and his family until defendant had presented evidence that the deceased was the aggressor and that defendant was acting in self-defense. The trial court reserved ruling on the motion until a preliminary showing of aggression by the deceased had been made.

The colloquy at trial was as follows:

"DEFENSE COUNSEL: Did you know Reuben Hernandez when you lived in Mexico?

DEFENDANT: Yes.

DEFENSE COUNSEL: And have you known Reuben Hernandez to have committed any acts of violence against your family in Mexico?

PROSECUTOR: Objection.

TRIAL COURT: Objection sustained. Maybe at this time I better make an official ruling on this motion in limine. * * * Motion in limine will be allowed or sustained except for those acts, for that evidence which would show a frame of mind or reason for a frame of mind or feeling that one is needed to defend himself of

the acts which occurred, or alleged to have occurred on April 17, 1976, and we will respect that period of time not longer than Friday of the day before the alleged incident."

■■ Defendant's counsel then made an offer of proof that if defendant were permitted to testify he would testify that during the years 1963 to 1972 he resided in Mexico and that the family of the deceased lived on the same ranchero. He would further testify that during those years, he had an uncle killed, another uncle shot, and a niece raped by the deceased. The deceased committed other crimes as well. The trial court excluded the proffered testimony but permitted evidence regarding events of the day before the incident as relevant to defendant's state of mind. We find that the trial court did not improperly circumscribe defendant's proof in this instance.

■■ In a criminal prosecution, in the absence of preliminary evidence of self-defense, evidence of specific acts of violence and threats made by the victim should not be admitted. (*People v. Allen* (1972), 50 Ill. 2d 280, 278 N.E.2d 762; *People v. Moore* (1975), 27 Ill. App. 3d 337, 326 N.E.2d 420.) Conversely, where defendant claims self-defense and some evidence of self-defense is introduced, evidence of deceased's violent character and prior threats and attacks toward defendant are admissible. (*People v. Davis* (1963), 29 Ill. 2d 127, 193 N.E.2d 841; *People v. Singleton* (1976), 41 Ill. App. 3d 665, 354 N.E.2d 464.) Such evidence is admitted for the purpose of showing defendant's apparent danger, the circumstances confronting him, and the motives which influenced his actions. (*People v. Johnson* (1969), 108 Ill. App. 2d 150, 247 N.E.2d 10.) However, threats alone do not justify the use of deadly force. *People v. Golson* (1945), 392 Ill. 252, 64 N.E.2d 462, *cert. denied* (1946), 328 U.S. 865, 90 L. Ed. 1635, 66 S. Ct. 1371; *People v. Pearson* (1976), 40 Ill. App. 3d 315, 352 N.E.2d 240.

In this case the record reveals that defendant shot and killed an unarmed man. Defendant admitted at trial that he did not look to see whether deceased was armed. Furthermore, defendant conceded on oral argument that no evidence of self-defense was introduced that would justify a finding that deceased was the aggressor. Nevertheless, defendant argues that the trial court erred in restricting testimony as to the character and past acts of the deceased which tended to explain defendant's state of mind at the time of the incident. Defendant, however, cites no case in support of his position precisely dealing with the question of the admissibility of alleged remote, specific acts of violence by the victim towards defendant's family as bearing on defendant's state of mind where there is no evidence of self-defense. Rather, defendant relies on cases which involved situations where some evidence was introduced indicating that the victims were the aggressors. *People v. Smalley* (1973),

10 Ill. App. 3d 416, 294 N.E.2d 305; *People v. Johnson* (1969), 108 Ill. App. 2d 150, 247 N.E.2d 10.

In reviewing the record, we find that although the trial court restricted defendant's attempts to introduce the deceased's past acts of violence, defendant was allowed ample opportunity to introduce state of mind testimony. Not only was defendant permitted to testify as to events occurring within a 24-hour period prior to the shooting, but Ms. Lara substantially testified to events which occurred years before as well. In testifying as to the content of defendant's statement, Lara stated that defendant claimed that there had been a feud between the families of defendant and the deceased and that the deceased had shot defendant's uncle.

Moreover, defendant testified as to the events bearing on his intent and state of mind at the time of the occurrence. He stated that he had seen the deceased the night before the incident when the deceased visited him at his home and threatened him. Earlier that day, he had engaged in a conversation with members of his family and had been informed that the deceased was in Harvey and had intentions of killing him and his family. On the day of the occurrence, he left his home to go to the store and encountered the deceased in the parking lot where Hernandez told him that he was a "dead man." He also testified as to the deceased's removing something from a pocket, a short time before he shot him. Defendant stated that he killed the deceased because he felt that the deceased was going to kill him.

The rule is that in criminal cases where the intention, motive or belief of the accused is material to the issue, he is allowed to testify directly to that fact, and to have the circumstances surrounding the act considered in connection with his testimony. (*People v. Biella* (1940), 374 Ill. 87, 28 N.E.2d 111; *People v. Graves* (1978), 61 Ill. App. 3d 732, 378 N.E.2d 293. In the present case defendant was given sufficient opportunity to testify as to his intention, belief and state of mind. The trial court had the benefit of this evidence in its deliberations.

For the above reasons we affirm the judgment of the trial court.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.