THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
BENNY E. PHILLIPS, Defendant-Appellant.

First District (1st Division)    No. 79-1470

Opinion filed May 4, 1981.

GOLDBERG, J., specially concurring.

Michael J. Pelletier, of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Richard F. Burke, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Benny Earl Phillips brings this appeal after a jury trial where he was convicted of one count of attempt murder (Ill. Rev. Stat. 1977, ch. 38, par. 8—4), four counts of aggravated battery (Ill. Rev. Stat. 1977, ch. 38, pars. 12—4(a), (b)(1)), and one count of armed violence based on the underlying offense of aggravated battery (Ill. Rev. Stat. 1977, ch. 38, par. 33A—2). He urges the following issues on appeal: (1) whether the State proved beyond a reasonable doubt that he was not acting in defense of another when he shot the complaining witness; (2) whether his sixth amendment right to confrontation and fifth amendment right to due process were violated by the trial court's restriction of the complaining witness' cross-examination; (3) whether the defendant was denied his

fifth amendment right to remain silent and his fifth amendment right to due process where the State cross-examined him and later commented during closing argument that he failed to notify anyone prior to his arrest that he had shot the complaining witness in defense of another; (4) whether the defendant was convicted of multiple offenses arising out of the same single act; and (5) whether the defendant's sentences should be reduced because the trial court failed to duly consider the factors in mitigation.

We reverse and remand for a new trial.

The defendant's convictions arose out of a shooting incident which took place on May 17, 1978, whereby Chicago Police Officer Jerry Stanley was seriously injured. Prior to trial the State filed two motions *in limine*. The first motion sought to preclude the defense from presenting any evidence of Stanley's blood alcohol content at the time of the shooting and the effect such alcohol content had on Stanley. This motion was denied. The second motion sought to preclude the defense from using information from Stanley's Chicago Police Department Internal Affairs Department file which revealed that from October of 1968 to the incident Stanley had been suspended 15 times including two instances, one in October 1968 and the other in February 1974, where Stanley improperly displayed his weapon and then filed a false report. Defense counsel argued that this evidence was admissible because it showed the complaining witness' prior bad acts. The trial court granted the motion *in limine* ruling that the matters contained in the file were collateral.

At the trial the State presented three witnesses in its case in chief. Officer Stanley testified that on May 17, 1978, he was on his annual furlough. He testified that on that afternoon he ate something about 12:30 p.m. and then proceeded to the Catesia Lounge where he played pinball and drank Old Fitzgerald bourbon with his cousin and brother-in-law. He stated that from approximately 1 p.m. to 4 p.m. he had four drinks. At about 4 p.m. he took his brother-in-law home, stopped by his mother's house, and then dropped his cousin back at the lounge. He then proceeded home by way of South May Street. On May Street, which is a one-way southbound street, he encountered a car blocking the street. He testified that he waited five or six minutes in his car and then asked a man, later identified as James Phillips, to move the car. He stated that he needed to enter the alley because he lived nearby. The man responded, "m_____ f_____, if you want to get by you either back out the street or drive through your car." Stanley testified that at this point he told James that he would get the car towed. He walked to a house across the street where three people were seated outside and asked them to phone the police but they refused. As he exited through the front gate of this house, he noticed that the car blocking his way had not been moved and that

James was advancing towards him with a tire iron held over his head. Stanley pulled his concealed gun and ordered the man to drop the tire iron. The man complied and Stanley began walking towards him with his gun still pointed at the man. The man retreated as Stanley approached him. When Stanley was within five to 10 feet of the man and still holding the gun on him, he was shot for the first time. The shot came from behind and struck him in the right eye. Stanley first identified himself as a police officer after he fell. After he made this disclosure, Stanley stated that he heard someone say, "He is a copper, kill him" and that this was when he was shot a second time. This shot struck him in the right front shoulder. According to Stanley's testimony, there was approximately a 10- to 15-second interval between the first shot and the second shot. After this shot he heard at least two and maybe three additional shots but he was not hit again.

Police Officer Maurice McCaster testified that on May 17, 1978, he responded to a call concerning a man being shot on South May Street and when he arrived at the scene discovered that the victim was a police officer. He found Officer Stanley lying on the ground in the middle of the street and a car with its motor running parked in the middle of the street which was later determined to be Stanley's car. McCaster recovered Stanley's weapon and found that there were no spent cartridges.

The State also called Kevin Tacker as a witness. Tacker testified that on May 17, 1978, he and his neighbor James Phillips were attempting to recharge his car battery by using jumper cables with James' car. While they were working on his car, Tacker stated that a man pulled up behind James' car which was double parked next to his so they could run the jumper cables between the cars. The man asked James whether he could move his car because it was blocking his way. Tacker identified this man as the complaining witness, Jerry Stanley. Tacker stated that James asked Stanley to wait a minute because they were trying to get the car started. Stanley waited for an unspecified period of time and then again asked if the car could be moved. At this point, according to Tacker, the two men exchanged words and curses. Shortly afterwards, James' car was moved from the middle of the street. Tacker next noticed Stanley on the other side of the street. He then heard someone say, "Well, he's got a gun." He looked up and observed Stanley at his car waving his pistol at James who was standing beside Tacker's car holding a tire iron. According to Tacker, as Stanley approached James he dropped the tire iron. James began backing up to avoid being struck by Stanley's gun. At this point Benny Phillips approached Stanley from behind and fired two consecutive shots at him.

After Tacker's testimony, there was a stipulation as to the extent of Stanley's eye injury. According to stipulation, Stanley lost at least partial

use of his eye and suffered at least some permanent damage. At this point the State rested.

The defense called James Phillips to the stand. He testified that he owned a home at 8621 South May and had been employed by International Paper Company for eight years. He testified that on May 17, 1978, after he returned home from work he helped Kevin Tacker try to start his car. While he was attaching starter cables to his and Tacker's car, Stanley drove up behind his car and said he wanted to get by. James testified that he asked Stanley to wait a few minutes because they were just about done but Stanley said "m_____ f_____, do you want me to have this car towed?" At this point James was unaware that Stanley was a police officer. After this conversation, Stanley walked to the east side of May Street and James removed the jumper cables from his car and had his brother Benny Earl Phillips, the defendant herein, move the car so that it would be out of the way. Shortly thereafter, Stanley returned from the other side of the street and continued to threaten to have James' car towed. At this time James was standing at the front of Tacker's car. Stanley returned to his car and James picked up his tools and laid them on top of Tacker's car. According to James, while Stanley was at his car he pulled his gun and began waving it in James' direction. He then came over to where James was standing and began hitting him with the pistol and telling him that he was going to whip him. James stated that he backed away from Stanley and then turned and ran. At this point he heard two shots. No shots were fired after these shots. He did not see who fired these two shots, although he did see his brother walking down the street after the shooting. James further testified that after the shooting he approached Stanley lying on the ground and only then did Stanley identify himself as a police officer. James stated that in his opinion Stanley must have been intoxicated because he was not walking right and was speaking loudly and using foul language.

Two additional defense occurrence witnesses who testified were Robert Lee and Curtis Johnson, who were on Lee's front porch watching the work progress on Tacker's car on the afternoon of May 17, 1978. Both observed Stanley drive up and a conversation ensue between him and James Phillips who was helping Tacker with his car. Both saw Stanley cross the street to talk with someone and then return to his car. Additionally, both testified that by the time Stanley returned to his car James' car had been moved down the street. Despite this fact, both men saw Stanley produce a gun from his car and start toward James saying that he was going to kick his m_____ f_____ a__. Both men heard shots fired but neither saw who had fired them because when they observed Stanley's drawn gun they gathered several children into Lee's house. Both stated they heard only two shots and that they were consecutive. Lee

stated that Stanley staggered and that in his opinion he was under the influence of alcohol.

Certain of Johnson's testimony was attacked as inconsistent with a statement made to an Assistant State's Attorney on the day of the shooting. In the statement Johnson had said that he was in the house when the second shot was fired and that the shots were not simultaneous. Johnson did not recall making the earlier inconsistent statement.

Also testifying for the defense was Zella Ross who lived directly across the street from Mr. Lee. She was on her back porch on May 17, 1978, at approximately 4 p.m. when she heard what she thought were two firecrackers exploding. The sequence of the sounds was bang-bang. She later heard about the shooting.

Benny Phillips took the stand in his own defense. His testimony closely parallelled that of the other defense witnesses. On May 17, 1978, he had been sitting watching his brother and Tacker try to get Tacker's car started. He observed the argument that ensued between his brother and Stanley after Stanley pulled up behind his brother's double parked car and walked down to Lee's house to see what the argument was about. He testified that he moved his brother's car out of the middle of the street after Tacker's battery was recharged. When he returned from moving the car he observed Stanley walk over to his car, pull a gun on his brother and then threaten to kick his m_____ f_____ a__. At this point he ran home to get a gun. His home was three houses south of the Lee home on the east side of the street. He got the gun because he was afraid that Stanley was going to shoot his brother.

When he returned to the scene, he saw Stanley pistol whipping or waving his gun at his brother. James had nothing in his hands at this time and was trying to back away from Stanley. The defendant testified that he fired two consecutive shots at Stanley with a .38 revolver because he thought Stanley was going to shoot his brother. He further testified that it was only after the second shot that Stanley identified himself as a police officer. The defendant stated that he left the scene after finding out that the man he had shot was a police officer, but watched the police come from the end of the block. He subsequently went home, changed his clothes and then went to a Taco house for a "pop." He was arrested at his home later that evening.

The parties stipulated that a blood sample was taken from Stanley at 4:59 p.m. on May 17, 1978, and that it revealed a blood alcohol concentration of .247. Subsequent to this stipulation, the defense called Dr. John J. Spikes, chief toxicologist for the Illinois Department of Public Health, to testify to the effects of alcohol on the human body. He testified that if given the blood alcohol concentration of an individual he could testify to a reasonable degree of certainty as to the intoxication or sobriety

level of that individual. He outlined the three states of inebriation. At a blood alcohol level of .05 to .1 a person loses inhibitions and the ability to make good decisions. Then at a blood alcohol level of .1 to .2 the individual loses his coordination and ability to walk and speak normally which usually results in a staggered walk and slurred speech. At a level of .335 an individual becomes comatose.

Dr. Spikes was given a hypothetical based on what condition a man of Stanley's weight, height, and age, who had eaten prior to starting to drink a particular bourbon would be in based on a blood alcohol level of .247. Spikes testified that he would have lost his inhibitions, lost his ability to make good judgments, and would have staggered and had slurred speech. Moreover, he noted that this hypothetical man could have had temporary amnesia at that level. He believed that it would have taken 15 drinks of normal strength to reach this blood alcohol level rather than the three or four drinks which Stanley testified that he consumed. Dr. Spikes believed that this man could have definitely been under the influence of alcohol at the time of the shooting but did admit on cross-examination that alcohol has a different effect on every person depending upon his emotional, mental, and physical state. He also noted that some people develop a tolerance to alcohol and that fear can affect a person's performance.

After hearing the evidence the jury returned verdicts of guilty on all counts. The trial court denied the defendant's oral motion for judgment notwithstanding the verdict and entered judgment on the verdict. The trial court also denied the defendant's written motion for a new trial and after hearing evidence in aggravation and mitigation sentenced the defendant to concurrent sentences of 15 years for the attempt murder and armed violence and 5 years for each of the four counts of aggravated battery.

■■ We find persuasive the defendant's argument that the trial court erred in granting the State's motion *in limine* restricting his right to cross-examine Officer Stanley as to his 15 prior suspensions from the Chicago Police Department. Initially, we note that prior to the trial of this matter defense counsel opposed the State's motion *in limine* because two principal issues at trial were whether Stanley was justified in showing his weapon and whether or not his account of the shooting was true. Defense counsel argued that his intended impeachment of Stanley would be based upon Stanley's prior bad acts. A witness' character cannot generally be impeached by prior misconduct but evidence of prior misconduct may be used to impeach a witness if it shows his bias, interest or motive to testify falsely. (See *People v. Barr* (1972), 51 Ill. 2d 50, 280 N.E.2d 708; *People v. Siler* (1980), 85 Ill. App. 3d 304, 406 N.E.2d 891; *People v. Cepolski* (1979), 79 Ill. App. 3d 230, 398 N.E.2d 351.) While the defense counsel's

proposed line of inquiry was not made explicitly apparent from the record, defendant in his brief on appeal argues that Stanley's prior misconduct and his suspensions raise the possibility that his testimony was influenced by bias, interest, or motive to testify falsely. In that the State has not argued that the defendant has deviated from his position at trial and in that important rights are involved, we will consider the defendant's argument as to whether the trial court unduly restricted his cross-examination as to Stanley's suspensions. See *People v. Cepolski.*

It is well established that the widest latitude allowable should be given to a defendant on cross-examination (*People v. Barr; People v. Naujokas* (1962), 25 Ill. 2d 32, 182 N.E.2d 700; *People v. Siler*), but that this latitude rests in the sound discretion of the trial court and will only be disturbed on a finding of clear abuse of discretion resulting in manifest prejudice. (*People v. Halteman* (1956), 10 Ill. 2d 74, 139 N.E.2d 286; *People v. Bristow* (1980), 80 Ill. App. 3d 535, 400 N.E.2d 511; *People v. Lenard* (1979), 79 Ill. App. 3d 1046, 398 N.E.2d 1054.) Showing bias, interest or motive to testify is an accepted method of impeachment. (*People v. Richmond* (1980), 84 Ill. App. 3d 1017, 406 N.E.2d 135; *People v. Thompson* (1979), 75 Ill. App. 3d 901, 394 N.E.2d 422.) Cross-examination for this type of impeachment is a matter of right subject only to the trial court's broad discretion to preclude repetitive or unduly harassing interrogation assuming a proper subject matter. *People v. Lenard; People v. Thompson; People v. Baptiste* (1976), 37 Ill. App. 3d 808, 347 N.E.2d 92; *People v. Pickett* (1975), 34 Ill. App. 3d 590, 340 N.E.2d 259.

■■ Moreover, where the defendant's theory is that the prosecution's witnesses are unbelievable, it is error not to allow cross-examination as to the witnesses' bias, interest or motive to testify. (*People v. Lenard; People v. Lake* (1978), 61 Ill. App. 3d 428, 378 N.E.2d 364.) The trial court has no discretionary power to deny the defendant the right to cross-examine the witness to show interest, bias, or motive. (*People v. Thompson; People v. Kellas* (1979), 72 Ill. App. 3d 445, 389 N.E.2d 1382.) As was noted in *Thompson,*

> "A trial court cannot preclude the defendant from showing the interest, bias or motive of a witness, and if it does so by its ruling, it cannot be sustained on the basis of an argument that the ruling was within the trial court's discretion. [Citations.]" (75 Ill. App. 3d 901, 904.)

Evidence of bias, interest or motive, however, must not be remote or uncertain because the evidence must potentially give rise to the inference that the witness has something to gain or lose by his testimony. *People v. Bristow.* See *People v. Eddington* (1979), 77 Ill. 2d 41, 394 N.E.2d 1185, *cert. denied* (1980), 445 U.S. 944, 63 L. Ed. 2d 777, 100 S. Ct. 1340; *People*

*v. Bradford* (1979), 78 Ill. App. 3d 869, 379 N.E.2d 863; *People v. Mitchell* (1977), 50 Ill. App. 3d 120, 365 N.E.2d 185.

The State argues that the trial court acted in its discretion in denying the defendant the opportunity to cross-examine Stanley as to his suspensions because this evidence was remote and entirely unrelated to the defendant and, therefore, could not have conceivably affected Stanley's bias, interest or motive to testify falsely. Moreover, the State terms obscure and tenuous the defendant's suggestion that Stanley might have been motivated to testify falsely based on his desire to avoid any disciplinary action or to lose any medical coverage or compensation while on medical leave if it were found that he had abused the power of his office by improperly displaying his weapon. We do not agree.

■■ Initially, we respond to the State's remoteness argument by noting that the fact that Stanley's prior suspensions arose out of incidents which did not involve the defendant is not determinative. The issue of the propriety of a trial court's ruling regarding the scope of cross-examination of a witness for bias, interest and motive has been raised in contexts where the defendant was involved. (See *People v. Barr* (1972), 51 Ill. 2d 50, 280 N.E.2d 708 (co-defendant's charges dropped in consideration for testifying); *People v. Lenard* (1979), 79 Ill. App. 3d 1046, 398 N.E.2d 1054 (police officer who testified for State had been involved in beating defendant after his arrest).) However, the issue has also been raised where the evidence of bias, interest or motive did not relate to any activity between the witness and the defendant. (See *People v. Mason* (1963), 28 Ill. 2d 396, 192 N.E.2d 835 (narcotics inspectors were defendants in other criminal case and had been recently suspended from the police force); *People v. Siler* (1980), 85 Ill. App. 3d 304, 406 N.E.2d 891 (witness facing extradition because of case pending in foreign jurisdiction); *People v. Richmond* (1980), 84 Ill. App. 3d 1017, 406 N.E.2d 135 (witness had pending bond forfeiture warrants).) The issue is, therefore, not whether the witness' contact with the defendant gives rise to a question of the witness' credibility, but rather, whether the witness' bias, interest or motive to testify call into question his credibility. *People v. Richmond*; *People v. Thompson* (1979), 75 Ill. App. 3d 901, 394 N.E.2d 422.

■■ Nor do we find that the evidence of Stanley's past suspensions was remote. If Stanley, as his Internal Affairs file apparently indicated, had been suspended from the police force on 15 prior occasions, he could have been motivated to testify falsely to avoid a further suspension, or worse, termination. Moreover, he could also have been motivated to testify falsely to insure the continuance of his medical coverage and compensation, no small matter where Stanley had no use of his left eye and uncertain use of his right eye. Such an inquiry was not collateral as the trial court indicated. (*People v. Garrett* (1976), 44 Ill. App. 3d 429, 358

N.E.2d 364.) In *People v. Robinson* (1977), 56 Ill. App. 3d 832, 371 N.E.2d 1170, the court held that it was error to preclude cross-examination of a police officer as to his suspension because it may have affected his testimony in that he might have testified in a certain way in order to avoid further disciplinary measures.

The instant case is distinguishable from *People v. Hanks* (1974), 17 Ill. App. 3d 633, 307 N.E.2d 638, cited by the State, where the trial court ruled that evidence that the key witness was fired from his job for theft was remote because law enforcement officials were unaware of the witness' theft and, therefore, could not have offered him leniency in exchange for his testimony. Nor was it likely that the witness' testimony was motivated by his fear that due to the theft he needed to take any suspicion from himself in that his testimony was consistent with his earlier statements made before he was fired. In the instant case, the Chicago Police Department was aware of Stanley's past suspensions, and therefore, his testimony in the instant case could very well have affected his status as a police officer.

The State points out that there was no evidence that Stanley was on suspension at the time of the trial or that his behavior was under review by any police agency. Additionally, the State notes that the defendant was not restricted in his cross-examination of Stanley of inquiring into other areas which might have showed his bias, interest or motive to testify including whether he was on suspension or under current review. While we believe that whether the complaining witness had been suspended or was under investigation would have been a valid area of inquiry to show bias, interest or motive (*People v. Mason* (1963), 28 Ill. 2d 396, 192 N.E.2d 835; *People v. Robinson* (1977), 56 Ill. App. 3d 832, 371 N.E.2d 1170), we believe that the inquiry into the prior suspension was also a proper topic of impeachment. This was not made less important merely because there were other avenues of impeachment which the defendant could have explored. (*People v. Baptiste* (1976), 37 Ill. App. 3d 808, 347 N.E.2d 92.) The ruling of the trial court restricting cross-examination prevented the jury from hearing evidence which could have affected Stanley's credibility, and the defendant had the right to present this evidence under the theory that the State's witness was unbelievable. *People v. Baptiste.*

■■ The State finally argues that it was readily apparent to the jurors that if Stanley's version of the shooting was not true, he could be subjected to disciplinary action and that, accordingly, the jury was aware of the very fact which the defendant now claims may have shown that the defendant was less than credible. We are not convinced that the inference of Stanley's possible motive to testify was clear to the jury. (See *People v. Vagil* (1973), 9 Ill. App. 3d 726, 292 N.E.2d 557.) Stanley's credibility as the key prosecution witness was of paramount importance in the instant

case because the defendant testified that he acted in defense of his brother in shooting Stanley. Therefore, even if the jury were aware of Stanley's possible bias, interest or motive to testify, it was for the jury to decide whether the past suspensions provided Stanley with a further motive to offer false testimony. *People v. Mason; People v. Richmond* (1980), 84 Ill. App. 3d 1017, 406 N.E.2d 135; *People v. Baptiste.*

In determining whether the trial court's restriction of cross-examination for bias, interest or motive is reversible error, courts look to whether the credibility of the witness in issue was crucial. If the witness' testimony was crucial, the restriction of cross-examination will have resulted in manifest prejudice to the defendant and consequently require reversal. *People v. Galloway* (1974), 59 Ill. 2d 158, 319 N.E.2d 498; *People v. Barr* (1972), 51 Ill. 2d 50, 280 N.E.2d 708; *People v. Lenard* (1979), 79 Ill. App. 3d 1046, 398 N.E.2d 1054; *People v. Garrett* (1976), 44 Ill. App. 3d 429, 358 N.E.2d 364; *People v. Vagil.*

In the instant case, while the State did offer the testimony of another occurrence witness, that witness' testimony differed materially from Stanley's as to the number of shots fired and the interval between the shots, and as to whether James Phillips' car was moved prior to the shooting. More importantly, Tacker's testimony differed from that of Stanley as to whether James acted as the aggressor by advancing on Stanley with a tire iron raised over his head while Stanley was leaving a house where he had tried to get someone to call the police to have the car towed. Tacker testified that he saw James standing by Tacker's car with the tire iron in his hands that he had been using to work on Tacker's automobile. At this same time he saw Stanley standing by his own car waving his gun at James and shouting. He then saw Stanley come over to where James was standing and start waving his gun in James' face although James had dropped the tire iron and was trying to avoid being hit by Stanley's pistol at this time. It was then that Stanley was shot by the defendant. This raises some doubt as to whether Stanley pulled his gun without any physical threat or provocation from James, whether Stanley was the aggressor in the shooting incident, and whether the defendant, in fact, acted in defense of his brother in shooting Stanley.

■■ Moreover, the testimony of the four defense witnesses corroborated the defendant's testimony as to the number and time sequence of the shots fired. The three defense occurrence witnesses also generally corroborated the defendant's testimony. Accordingly, the credibility of Stanley's testimony was indeed crucial. We believe that the limitation of the defendant's cross-examination of Stanley did act to his prejudice and requires us to reverse and remand this cause for a new trial.

We believe that this finding is consistent with the caution urged by the Illinois Supreme Court in regard to the use of motions *in limine.*

(*Reidelberger v. Highland Body Shop, Inc.* (1981), 83 Ill. 2d 545.) The court noted that,

> "An *in limine* motion permits a party to obtain an order before trial excluding inadmissible evidence and prohibiting interrogation concerning such evidence without the necessity of having the questions asked and objections thereto made in front of the jury. Thus, the moving party will be protected from whatever prejudicial impact the mere asking of the questions and the making of the objections may have upon a jury. [Citation.] The ability to restrict interrogation makes the *in limine* order a powerful weapon. This power, however, also makes it a potentially dangerous one. Before granting a motion *in limine*, courts must be certain that such action will not unduly restrict the opposing party's presentation of its case." 83 Ill. 2d 545, 549-50.

■■ In light of *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366, we must address the defendant's reasonable doubt argument. From the evidence presented, we believe the jury could have properly found the defendant guilty. Although there were material contradictions between the State's witnesses, the jury could have believed that Tacker was biased because he was a neighbor of the defendant and therefore lacked credibility (*People v. Simmons* (1950), 407 Ill. 417, 95 N.E.2d 477; *People v. Beasley* (1977), 54 Ill. App. 3d 109, 369 N.E.2d 260), while Stanley was a credible witness. It is well recognized that the testimony of a single witness is sufficient to sustain a conviction. (*People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182; *People v. Flores* (1979), 79 Ill. App. 3d 869, 398 N.E.2d 1132.) We make this ruling with the same caution exhibited in *People v. Thompson* (1979), 75 Ill. App. 3d 901, 905-06, 394 N.E.2d 422, where the court noted:

> " * * * we make no finding as to defendant's guilt that would be binding on the court on retrial. Indeed, defendant is entitled to her presumption of innocence. Our consideration of the sufficiency of the evidence question comports with the supreme court's mandate in *Taylor* to protect defendant's constitutional right against double jeopardy."

We also find it necessary to comment on an issue which might be raised again in the defendant's second trial. The defendant has argued that testimony elicited on cross-examination concerning his pre-arrest silence denied him due process of law and violated his right to remain silent. On cross-examination the defendant was asked whether immediately following the shooting he contacted the police, his pastor or anyone in the community as to the fact that he had shot Stanley in defense of his brother. The defendant admitted that he had contacted no one during the short four-hour interval between the shooting and his arrest. During

closing argument the prosecution emphasized this testimony and the fact that the defendant had not advanced the self-defense argument right after the shooting.

The United States Supreme Court recently addressed this issue in *Jenkins v. Anderson* (1980), 447 U.S. 231, 65 L. Ed. 2d 86, 100 S. Ct. 2124. The court found that this type of inquiry into a defendant's pre-arrest silence was violative of neither a defendant's due process rights nor his right to remain silent. However, the court specifically provided that any State could formulate its own rules determining the probativeness of such evidence and that, as such, it could find this type of inquiry impermissible. The defendant, without the benefit of authority, urges this court to find this inquiry impermissible. It is argued that the defendant's silence was not necessarily inconsistent with his testimony that he acted in defense of his brother because the defendant could have reasoned that because of Stanley's status as a police officer he would not receive a "warm welcome at the police station." It is also urged that the defendant's inexperience with the police and the criminal justice system caused him to be frightened after the shooting incident and that it was this fright and not his guilt which was evidenced by the defendant's pre-arrest silence. We find no reason to depart from the result reached in *Jenkins.* We believe that the trier of fact should determine the proper weight to be given the defendant's pre-arrest silence in light of his testimony of what transpired on the day of the shooting as well as the reasonable inferences which could be made from the circumstances.

For the foregoing reasons the judgment of the circuit court of Cook County is reversed and remanded for a new trial.

Reversed and remanded for a new trial.

McGLOON, J., concurs.

Mr. JUSTICE GOLDBERG, specially concurring:

I concur with the result reached by my esteemed colleagues. I concur also with the legal propositions upon which the result is based. However, I deem it necessary to add one cautionary point.

As shown by the authorities cited in the opinion, wide latitude should be permitted in cross-examination by defense counsel, and a demonstration of bias is a proper goal. However, in the instant case, this accepted standard should not be mistakenly applied to the substantive legal questions arising in connection with proof of self-defense.

It appears to me that self-defense depends in part not only upon the fact of aggression, but also upon the subjective element that the character and past conduct of the aggressor were known to the defendant. Where

self-defense is an issue, the law permits proof of specific acts of violence and threats by the deceased. Prior conduct of the aggressor may properly be shown by a defendant as an element of self-defense provided that defendant was aware and had knowledge of these past events. (See *People v. Stombaugh* (1972), 52 Ill. 2d 130, 139, 284 N.E.2d 640; *People v. Davis* (1963), 29 Ill. 2d 127, 130, 193 N.E.2d 841; *People v. Adams* (1962), 25 Ill. 2d 568, 572, 185 N.E.2d 676; *People v. Carbajal* (1978), 67 Ill. App. 3d 236, 241, 384 N.E.2d 824; and *People v. Graves* (1978), 61 Ill. App. 3d 732, 740, 378 N.E.2d 293.) The important matter here is "to show the defendant's state of mind." *Stombaugh*, 52 Ill. 2d 130, 139.

In the instant case, although proof of past conduct by Officer Stanley and his prior problems in connection with his status as a police officer were competent and material to show his possible bias as a witness against the defendant, this evidence was neither competent nor proper on the substantive issue of self-defense. Upon a retrial of the instant case, a determination should be made as to whether this problem should be the subject of a cautionary instruction to the jury.